[Crim. No. 4596. In Bank. Nov. 1, 1945.]

THE PEOPLE, Respondent, v. STEPHEN BENDER, Appellant.

Ward Sullivan for Appellant.

Robert W. Kenny, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendant (known as Richard Bennett) was convicted of the murder of his wife, Rena Bennett. The murder was found to be of the first degree. He appeals from a judgment imposing the death penalty and from an order denying his motion for a new trial. The defendant urges as grounds for reversal the failure of the trial court of its own motion fully to instruct the jury as to the law applicable to circumstantial evidence and the giving of an instruction that, if the specific intent to take life exists at the time of the killing, the offense "would of course be murder of the first degree." He further contends that as a matter of law the evidence at most establishes manslaughter. We have concluded that the evidence is sufficent to establish that the homicide was murder but insufficient to establish that such murder was deliberate and premeditated, and that the only prejudicial errors relate solely to the degree of the crime and do not warrant a reversal if the judgment is reduced to an adjudication of murder of the second degree. Therefore, pursuant to the power vested in us by section 1181 of

the Penal Code, the judgment should be reduced to impose the penalty prescribed by law for murder of the second degree and, as so modified, affirmed.

Defendant and Rena intermarried in September, 1943. Thereafter Rena learned from defendant's first wife, June, that defendant and June were not divorced. The married life of defendant and Rena was marked by violent quarrels, reconciliations, and discussions of Rena's intention to have the marriage annulled and the intentions of Rena and defendant to commit suicide. After January, 1944, defendant testified, he and Rena drank from two to four quarts of liquor each day.

The evidence adduced by the People is as follows:

On March 8, 1944, defendant wrote to Rena, "Now I hope you are satisfied. You thought I would not take my own life, but again you are wrong. I promised you . . . to take you with me when I died, but I feel that you made me promise to do so only because you never thought I would. No, Rena, dear, I love you too much to hurt you. . . . I could fill numerous pages with criticism and also some of your good qualities, but I know my death due solely to your actions is sufficient. Now you won't have . . . to get an annulment . . . [D]o the same as I am going to do, kill yourself, then you cannot hurt someone else." On March 10, 1944, defendant wrote to the Los Angeles Police Department, "I am taking my own life. . . . My wife is the cause of my suicide." These letters were never sent and defendant did not carry out his stated intention to commit suicide.

About March 29, 1944, defendant was arrested on the complaint of his first wife. The nature of the charge does not appear in the record. Defendant was confined in the Los Angeles County jail. Rena visited him there from time to time. On May 3, 1944, defendant sent Rena an affectionate letter saying that he loved her "beyond description of mere words," asking her to move from the Los Angeles apartment which had been their home because "Too many unpleasant memories are connected in that building to ever give you peace of mind. . . . I never was happy there. . . . If I had 'peace of mind' I never would have said nor done some of the things that occurred in that building. . . . Both you and I are too intelligent to be so small as to let a misunderstanding and a 'jealous' greedy woman—June—come between us. . . . I'll do my part, please do yours by me." On Thursday,

May 11, 1944, defendant was released from jail and returned to the apartment (from which Rena had not moved).

Apart from defendant's testimony the only direct evidence of defendant's relations with deceased from May 11 until the night of May 15, when she was killed, is as follows: The manager of the apartment house was in the Bennett apartment and saw Mrs. Bennett on Friday morning, May 12; Mrs. Bennett appeared to be in good spirits. About 1 o'clock Sunday morning, May 14, one Mrs. Bailey, who lived across the hall from the Bennetts, visited them at Mrs. Bennett's "quite emphatic" request. Mrs. Bailey talked with the Bennetts for about an hour. The "conversation wasn't very interesting. I mean I wasn't paying much attention." Mr. and Mrs. Bennett did not appear to be quarreling; among other things "they were sort of talking about love or something like that. Well, they didn't seem to agree on it"; defendant said "something to the effect that he loved her, and she laughed and said, 'Isn't that funny?'" They had only one or two drinks during the hour and Mrs. Bailey "wouldn't say she [Rena] was intoxicated."

On Monday morning, May 15, defendant left the apartment to appear in court. While he was away one Prebensen, who had agreed to employ Mrs. Bennett, visited the apartment. He arrived about 9:30 and was there for about ten minutes; she then appeared normal and he did not detect the odor of alcohol on her breath.

At about 5 p. m. on May 15 the maintenance man of the apartment house saw Mrs. Bennett on the street near the house; "she seemed to be cheerful as always." No one except defendant testified to having seen Mrs. Bennett alive thereafter.

The manager of the apartment house was in the Bennett apartment for a few moments each day from May 16 through May 19. On Tuesday, the 16th, she noticed nothing unusual; the apartment was "in perfect order." On Wednesday, the 17th, the maids pulled down the in-a-door bed and found blood stains on the bedding. On the floor in the closet behind the bed was a large bundle on which suitcases and a lamp were piled. The maids did not clean the apartment or change the bed. On Wednesday evening the manager saw a note propped up on a table in the apartment. This note was from defendant to Rena, dated Tuesday, May 16, and reads: "Honey: Cannot wait any longer for you to get home. Have several appointments downtown. . . . Will be back late this

afternoon. *Please* wait until I get home. You can understand my feelings after what you told me last evening. I walked practically all night. Got here at 6:00 this morning. Hope you are at Min's [Rena's mother] instead of the hotel with Mike. Why do you do these things?'' On Friday afternoon the police were called and found that the bundle in the closet contained Rena's body.

There were two ragged lacerations on the front of her head, abrasion of the right cheek, and bruised areas on the forehead, lower lip, and around the right eye. Finger marks on the neck, the condition of the deep tissues of the neck, and the condition of the lungs, indicated strangulation which contributed to cause death. The immediate cause of death was the head injury. The autopsy surgeon ''could not state whether they [the two wounds on the head] were due to something hitting the head or due to the head hitting some object.'' The brain contained .22 per cent alcohol, which indicates intoxication.

On Tuesday, May 16, defendant, under an assumed name, registered at a Los Angeles hotel. He checked out on May 22. On May 24 the police found him lying in a penthouse storeroom on the roof of the hotel. He ''seemed to be in a dazed condition.'' His clothing and the sheet on which he lay were bloodstained. On each forearm were superficial cuts which ''appeared suicidal in type.'' Strapped to one wrist were letters signed by the defendant. One letter was addressed to the Los Angeles Police Department, dated May 15, and reads in part, ''I am taking my own life. . . . My wife admitted to me last evening that she was untrue to me . . . I'm too hurt by her infidelity to write her. . . . I shall die only for her sake. Hope my death will make a better woman of Rena.''

June (the first wife) received a letter from defendant dated Tuesday, May 16, which reads in part: '' [Y]ou are primarily responsible for my death. As I know Rena would not have done what she did if you had not lied to her. She went completely haywire and I know they will blame me for her death. I came home this morning at 5 a. m. and found her dead. I don't know who killed her, but wish I did before I join her in death. . . . I am going to jump off this roof. . . . I was too panicky to let Rena be as I found her. . . . I had [sic] her in the closet, hoping to gain time to settle all my affairs. . . . Whoever killed her had a good cause, for I know she did

me dirt, but now I can only think of her in her goodness."

There is some evidence (not relied on by the People on appeal) which suggests an attempt to show that defendant stole a watch and twenty dollars from deceased. On May 16 defendant pawned Rena's and his watches. He testified that Rena had given him her watch and asked him to pawn it. One Nardoni testified that on Monday morning, May 15 (i. e., definitely before Rena was killed), defendant showed him a man's watch and a woman's watch which resembled the watch of Rena that defendant pawned after she was killed, and told Nardoni that he was going to pawn them "for the purpose of raising some money he owed me." Rena's mother testified that some time before May 7 Rena told her that she had twenty dollars in the sleeve of a certain coat; that after Rena's death she (the witness) examined the coat; on it was a spot which appeared to be blood and there was no money in either sleeve. From defendant's testimony it appears that Rena wore this coat to dinner on the night she was killed. There is, however, no contention that the evidence is sufficient to show that the homicide occurred in the perpetration of robbery.

Defendant's testimony as to the events surrounding the death of Rena is as follows:

After he was released from jail on May 11 and returned to the apartment he and Rena drank a great deal. On May 14 Rena told him that she had, on May 11, filed an action for annulment of their marriage. On Monday, May 15, after he had appeared in court and returned to the apartment at about 10:45 a. m., they drank almost continually, both gin and bourbon. About noon, after they had sexual relations, Rena told defendant that she had received $200 from Prebensen "for which I am supposedly to go to work for him" and that while defendant was in jail she had an affair with Prebensen. (Prebensen testified that he had agreed to employ Mrs. Bennett and had advanced her $200 as her first month's salary and that he had never had sexual intercourse with Mrs. Bennett.) Defendant "became very angry and told her that I felt that any man or woman . . . that would be untrue to one or the other when one or the other was either in a hospital or in jail, where they could not defend themselves, was rather a low type of person. . . . When she was drinking and when you crossed her up, she [would] become very vio-

lent; she would fling out her arms or throw things; and at this time," after defendant called her a "common whore," she struck him on the right side of his face (defendant's right eye was blind) "and I must have struck her, because even after that she started crying and I felt sorry and we got up and we had some more to drink." About the middle of the afternoon defendant asked Rena, "Is that the only one that you have been running around with?" He reminded her that they had "promised each other that we would always be honest and truthful with each other." Rena said that, when defendant was in jail, she "had been to some cocktail bar and talked to some people, and then they came back to the apartment late and they had some more drinks at the apartment; and she said she felt very humiliated when she woke up and she found this man there." Defendant and Rena later fell asleep and were awakened by a newsboy at about 5 p. m. (the time when, the maintenance man testified, he saw Mrs. Bennett on the street). Defendant "suggested that we have something to eat, because all that day I did not have a thing to eat and the prior day . . . we didn't have anything to eat." Rena asked defendant to wait until 6 because she expected Mr. Prebensen to return at that time with word from her attorney concerning the annulment. They had more drinks. At about 7 o'clock defendant, at Rena's request, went out and purchased brandy. He returned and at about 7:30 they went to a nearby cafe for dinner. During dinner defendant "again mentioned about her infidelity and she remarked about some service man . . . and the eventual thing was that she took him home. . . ." They returned to the apartment and continued drinking. Prior to this day defendant had thought that Rena was unfaithful to him but he had never accused her, and she had never told him, of her infidelity.

Throughout the evening, defendant testified, "we would argue and forgive and then argue, and during the evening two or three times something I would say she would get indignant and fly at me, and on one of those times she was flying at me she slipped on that little hook rug, nothing serious." And on another occasion "I think I pushed her down on the couch." "[T]hat is about all I can recall right at this second, it was just constant wrangling all evening long." Rena appeared to be "a little drunker than usual," "plenty drunk," and defendant "wasn't just to say cold sober, but I wasn't

dead drunk, either.'' At one time during the evening, while Rena was out of the room, defendant wrote the suicide note addressed to the police which was found strapped to his wrist. After further argument Rena ''got on her knees,'' begged forgiveness, and said, ''Honey, go on out and take a walk . . . you are an understanding person, that is one thing I love about you. . . . But go take a walk.'' After her continued insistence defendant went out, walked about for a time, and returned to find the apartment dark and Rena gone. He wrote the note to Rena which the apartment house manager found. He had another drink, went out, walked past the home of Rena's mother and, seeing no lights, walked about for a time and then returned to the apartment. A small light was on and Rena was lying across the bed. He asked, '' 'What in hell are you doing on the foot of the bed?' There was no answer, so I . . . put the floor lamp on, and that is the time I discovered the body. . . . I am kind of hazy [as to what I did], I know I was rather shocked. I do remember of running out of the apartment to go to the manager's apartment to call the police . . . I happened to think, well, my God, where have I been, and I came back again to the apartment and . . . this is also hazy, these many things—but I remember putting my ear to her chest and it felt cold and I felt that she . . . was dead. . . . I don't remember now whether these are in order . . . I remember again going out of the apartment again to go over to Betty's [Mrs. Bailey] and call, and then again it came to my mind that I had been in prison [for violation of the Corporate Securities Act] . . . and that I had heard a great many boys in prison discussing alibis and what chance have you got if you are a loser . . . I went through the turmoil that I wanted to die . . . [and considered various methods of suicide and the fact that I owed two or three people money. I thought,] 'It takes time to do these things, and if somebody comes in the apartment they will find her and I won't have time' . . . so I felt that I will just lay her on the floor and close the door so tomorrow morning [Wednesday, when the maids cleaned the apartment] they will find her, and in the meantime I will be able to settle up all of these affairs. . . .'' Defendant wrapped the body in a blanket, placed it in the closet, and piled suitcases and a lamp on it. He left the apartment and went from hotel to hotel seeking ''a room that was high up'' without success. He then pawned his and Rena's watches

and paid two bills. He found a hotel room and registered under an assumed name because he "wanted certain time to do certain things . . . I realize it, that it looks bad, but I didn't do it for any specific purpose but that." After he registered at the hotel he drank "constantly." Defendant remembers that he checked out of the hotel on Monday, May 22, and went up to the storeroom on the roof. "The next thing I remember was when I awakened in the Georgia Street Receiving Hospital," where the police took defendant after they found him in the storeroom.

The foregoing account is similar to defendant's statements to the police made at various times after his arrest except that he did not tell them of returning to the apartment on the night of the 15th and finding no one there, but only of returning and finding the body of deceased. He took the officers over the course he followed on his walk. He told them that "the only mistake I made" was to move the body and to fail to notify the police when he found it. Defendant consistently and vigorously denied that he had killed Rena.

About four days after his arrest defendant said to Officer Brennan, "I will bet all the tea in China that you don't convict me of first degree murder." According to defendant he added, "because I didn't do it, and you know . . . I didn't do it." According to Officer Brennan defendant added, "I might . . . make a deal with you and cop out on [plead guilty to]" manslaughter; and later defendant said he was going to "cop out and do six [years and] six [months]," then said, "No, I have changed my mind about that." Defendant denied that he had ever said he would be willing to plead guilty to manslaughter.

Officer Brennan testified that defendant refused to submit to a lie detector test because, defendant said, Dr. DeRivers, police psychiatrist, advised him not to take the test. Defendant testified that he told the officers that he was willing to take the test if his attorney and Dr. DeRivers were present; that Dr. DeRivers had examined defendant and "he told me that he realized my physical and nervous condition; that I should not do anything, or that is what I understood, until I talked to him again"; and the officers refused to give him the lie detector test unless he took it immediately, without the presence of his attorney and Dr. DeRivers.

■ The evidence which tends to show that defendant killed his wife is entirely circumstantial. Defendant contends

that, therefore, the trial court of its own motion should have given an instruction embodying the principle (as stated in 8 Cal.Jur. 371, § 405) "that, to justify a conviction, the facts or circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion." It cannot be too strongly emphasized that such quoted statement enunciates a most important rule governing the use of circumstantial evidence. In unequivocal language it should be declared to the jury in every criminal case wherein circumstantial evidence is received. ██ The general rule relating to the duty of the court in giving instructions in criminal cases is stated in *People* v. *Warren* (1940), 16 Cal. 2d 103, 116-117 [104 P.2d 1024] : " 'It is the duty of a court in criminal cases to give, of its own motion, instructions on the general principles of law pertinent to such cases, where they are not proposed or presented in writing by the parties themselves. But it is not its duty to give instructions upon specific points developed through the evidence introduced at the trial, unless such instructions are requested by the party desiring them. When the court fully and fairly charges the jury upon the law appertaining to the facts of the case, its failure to instruct on any particular matter deemed essential is not error in the absence of a request for such an instruction.' (8 Cal. Jur. 309, and cases cited.) All of these general principles should be considered in determining whether the trial court has performed its duty in any particular case." To the same effect is *People* v. *Scofield* (1928), 203 Cal. 703, 709-710 [265 P. 914]. In a criminal case where circumstantial evidence is substantially relied upon for proof of guilt it is obvious that "instructions on the general principles of law pertinent to such cases" necessarily include adequate instructions on the rules governing the application of such evidence.

In respect to the particular rule now invoked by the defendant the District Court of Appeal in *People* v. *Hatchett* (1944), 63 Cal.App.2d 144, 155 [146 P.2d 469], after a review of cases which concern the question, stated that "Neither the statement in an instruction that the guilt of the defendant must be established beyond a reasonable doubt, nor the statement that as between two opposing reasonable inferences the one which is consistent with innocence must be preferred to the one tending to show guilt, satisfies the right of the defendant to have the jury instructed that where circum-

stantial evidence is relied upon by the People it must be irreconcilable with the theory of innocence in order to furnish a sound basis for conviction.'' In accord is *People* v. *Rayol* (1944), 65 Cal.App.2d 462, 464 [150 P.2d 812]. However, in view of the constitutional rule (art. VI, § 4½) that "No judgment shall be set aside, or new trial granted, in any case, on the ground of misdirection of the jury . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error . . . has resulted in a miscarriage of justice,'' it does not necessarily follow that the failure to state the principle in substantially the language above quoted will be ground for reversal.

It must be pointed out that defendant requested no instructions. He relies upon the holding of *People* v. *Putnam* (1942), 20 Cal.2d 885, 890 [129 P.2d 367], that "It is incumbent upon a court in a criminal case to instruct the jury of its own motion, charging them fully and fairly upon the law relating to the facts of the case. [Citations.] . . . An instruction is necessary if it is vital to a proper consideration of the evidence by the jury. [Citations.]'' (See *People* v. *Trumbo* (1943), 60 Cal.App.2d 681, 688 [141 P.2d 225]; *People* v. *Holt* (1944), 25 Cal.2d 59, 64 [153 P.2d 21].)

The People, in this connection, call attention to the fact (not mentioned in the last cited opinions) that in 1935 section 1127 of the Penal Code was amended to read, "the court *may* instruct the jury regarding the law applicable to the facts of the case'' (italics added), whereas before 1935 the section provided that "the court *must* state to them all matters of law necessary for their information'' (italics added). From a literal reading of section 1127 and subdivision 6 of section 1093 of the Penal Code ("The judge may then charge the jury, and must do so on any points pertinent to the issue, if requested by either party'') it may appear that the duty of the trial judge to give instructions, in the absence of request therefor, extends only to those instructions which the Penal Code expressly requires. But we cannot believe that, as the People argue, "the legislative intent, by the amendment [of section 1127 in 1935], was to relieve the court from the duty of charging the jury, on the court's own motion, on *all* matters of law necessary for their information . . .'' (Italics added.) The verdict of a jury uninstructed as to the law relating to the facts of a case cannot be sustained merely because proper instructions were not requested.

■ Here, however, the jury were not altogether uninstructed as to the law necessary to a proper consideration of circumstantial evidence. They were told that ''If the evidence in this case is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant's innocence, and reject that which points to his guilt.'' This instruction is eminently proper as far as it goes. To it should have been added a direct statement of the precise principle under discussion. But examination of the record discloses that circumstances relied upon by the prosecution and left unexplained, or with an explanation which must have appeared unreasonable to the jury, point irresistibly to defendant as the perpetrator of the homicide and, as hereinafter discussed, indicate that he acted with that ''malice aforethought'' which constitutes the killing murder. Since the quoted instruction was given, the failure to give the further instruction is not, upon the facts of this record, ground for reversal.

■ Once the jury had so found, there remained for their determination the more difficult question of the class and degree of the homicide. The evidence does not, as the People contend, compel the inference that the killing was murder of the first degree because perpetrated by means of torture (*cf. People* v. *Murphy* (1934), 1 Cal.2d 37, 41 [32 P.2d 635]; *People* v. *Cardoza* (1943), 57 Cal.App.2d 489, 498 [134 P.2d 877]; *People* v. *Duggan* (1943), 61 Cal.App.2d 379, 380 [143 P.2d 88]). Whether or not the two wounds on deceased's head, the immediate cause of her death, were the result of defendant's striking her with a blunt instrument, the evidence, as a matter of law, is insufficient to prove torture. The killer who, heedless of the suffering of his victim, in hot anger and with the specific intent of killing, inflicts the severe pain which may be assumed to attend strangulation, has not in contemplation of the law the same intent as one who strangles with the intention that his victim shall suffer. The following words of Blackstone, written in another connection (killing by stabbing), apply here: ''For in point of solid and substantial justice, it cannot be said that the mode of killing, whether by stabbing, strangling, or shooting, can either extenuate or enhance the guilt; unless where, as in case of

poisoning, it carries with it an internal evidence of cool and deliberate malice." (II Cooley's Blackstone, 4th ed., 1360.) Any implication in *People* v. *Duggan, supra,* that choking as a matter of law is torture within the meaning of section 189 of the Penal Code must be disapproved.

The evidence does not, as defendant contends, establish at the most that defendant was guilty of manslaughter. It cannot be said of the injuries inflicted here, as was said in *People* v. *Kelley* (1929), 208 Cal. 387, 393 [281 P. 609], that "there is nothing in the record from which it may with reason be argued that they were inflicted with that intent or that malice aforethought which is a necessary ingredient of the crime of murder." The evidence that deceased was strangled supports the finding that defendant acted with "malice aforethought"; i. e., "the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, §§ 187, 188.) That finding, and the further finding that defendant did not act on provocation adequate to reduce the offense to manslaughter, are based on sufficient evidence and, hence, are binding on us.

If the jury found that there was no considerable provocation and that the defendant acted with "an abandoned and malignant heart" the "malice" would be "implied" and the murder would be of the second degree. Only if they found that the "intention unlawfully to take away the life of a fellow creature" was a considered intent arrived at or carried out as the result of deliberation and premeditation, could the murder be of the first degree. (Pen. Code, § 189; *People* v. *Holt* (1944), *supra,* 25 Cal.2d 59, 87, 90; *People* v. *Thomas* (1945), 25 Cal.2d 880, 901 [156 P.2d 7].) But here, as in the Thomas case, *supra,* the jury were instructed that "If the unlawful killing is done without the provocation and sudden passion *which reduces the offense to manslaughter,* or is done in the commission of an unlawful act, the natural consequences of which are dangerous to life, . . . or the circumstances of the killing show an abandoned heart, *this is murder of the second degree, unless the evidence proves the existence in the mind of the slayer of the specific intent to take life. If such specific intent exists at the time of such unlawful killing, the offense committed would of course be murder of the first degree."* Other instructions as to the class and degree of the homicide were in material part substantially similar to other instructions likewise given in the Thomas case and quoted

at length at pages 892 and 893 of 25 Cal. 2d. ''Specific intent'' obviously is not necessarily the same as that ''wilful, deliberate and premeditated'' intent which is essential to make the homicide now under consideration murder of the first degree. As hereinafter discussed more fully, a ''specific intent'' unlawfully to take life (accompanied necessarily in every case by malice aforethought) is normally an element of second degree murder, and such intent is, of course, present in voluntary manslaughter. That other and conflicting instructions, some of them correct in themselves, distinguishing murder of the first and second degrees were given, does not, under the circumstances shown, make the italicized portions of the above quoted instruction any the less erroneous or prejudicial. (*People* v. *Thomas, supra,* pp. 901-902 of 25 Cal. 2d.)

If the testimony, letters, and declarations of defendant are disregarded the evidence tends to show only that defendant killed his wife while she was intoxicated; there is then substantially no evidence casting light on either motive for, or intent at the time of, the killing. ''When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree.'' (*People* v. *Howard* (1930), 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385].)

On the other hand, if the testimony, letters, and declarations of defendant are considered as a whole they show that the marriage of defendant and deceased began inauspiciously when defendant failed to tell deceased that his previous marriage had not been dissolved, and that some eight months later the violent disagreements which characterized the marriage culminated, after several hours of drunken quarreling, in murder. The picture of the events which led up to the murder and the events which followed it is a consistent one, interrupted only by the defendant's denial that he killed his wife. This picture suggests reasons for and the facts of quarreling between decedent and defendant but leaves only to conjecture and surmise the conclusion that defendant either arrived at or carried out the intention to kill as the result of a concurrence of deliberation and premeditation. Overwhelmingly opposed to such conjecture or surmise, and con-

sistently evidenced by every circumstance, is the rationale of a tempestuous quarrel, hot anger, and a violent killing.

It is contended, in effect, that the evidence is sufficient to sustain the jury's finding that the murder was of the first degree even though it establishes only that the homicide was perpetrated by a violent act on the spur of the moment during the hot anger of a tempestuous quarrel. This, indeed, is substantially what the court told the jury was the law. (See instructions hereinafter quoted.) But such view of the law invokes a standard which is not warranted by and is inconsistent with our statute.

"Murder," says the Penal Code (§ 187), "is the unlawful killing of a human being, with malice aforethought."

Thus "malice aforethought" is made an essential element of the crime of murder whether it be of the first degree or of the *second* degree. "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Pen. Code, § 188.)

"The words 'malice' and 'maliciously' import a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law" (Pen. Code, § 7, subd. 4) but they do not, at least insofar as implied malice is concerned, require a preexisting hatred or enmity toward the individual injured. "All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, is murder of the first degree; and all other kinds of murder are of the second degree." (Pen. Code, § 189.) "Manslaughter is the unlawful killing of a human being, without malice. It is of two kinds: 1. Voluntary—upon a sudden quarrel or heat of passion. 2. Involuntary—[not material here]." (Pen. Code, § 192.)

It is implicit in the above-quoted definitions that malice aforethought is, as above mentioned, an essential element of murder of the second as well as of the first degree and that such malice aforethought is not synonymous with the elements of deliberation and premeditation which must accompany a homicide to characterize it as murder of the first

degree. Obviously, if malice aforethought necessarily included or presupposed a deliberate and premeditated intent then all murder would be of the first degree because any homicide, to constitute murder at all, must be an unlawful killing with malice aforethought; and the Legislature would be guilty of an utterly meaningless classification of murder into two degrees, with no field in which the second could operate. ▆▆ Likewise it is obvious that the mere intent to kill is not the equivalent of a deliberate and premeditated intent to kill. The intent to kill exists in voluntary manslaughter but for such a homicide, where the evidence shows merely the intent to kill (coupled, of course, with actual killing) but does not show premeditation, deliberation, or malice, either express or implied, the Legislature, recognizing the frailty of human nature and the effect of great provocation, has set up a separate class and assessed a lighter penalty than is provided where the other elements exist. (Upon reason it can well be argued that malice—an intent to injure—must exist in voluntary manslaughter, but, as has been pointed out elsewhere (*People* v. *Holt* (1944), *supra,* 25 Cal.2d 59, 85), malice, by common law tradition, is presumed to be wanting in voluntary manslaughter.)

In its classification of malice the Legislature has further evidenced the intent to distinguish between deliberate acts and hasty or impetuous acts. It declares, as quoted above, that "Such malice [malice aforethought] . . . is express when there is manifested a *deliberate* intention unlawfully to take away the life of a fellow-creature. It is implied, when *no considerable* provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (Italics added.) ("Considerable provocation" would reduce the offense to manslaughter.)

It becomes apparent that the Legislature has set up in California three major divisions of unlawful homicides:

▆▆ 1. Manslaughter (voluntary; we are not here concerned with involuntary manslaughter): a willful act ("In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence" (Pen. Code, § 20)) characterized by the presence of an intent to kill engendered by sufficient provocation and the absence of premeditation, deliberation, and (by presumption of law) malice aforethought.

▆▆ 2. Murder of the second degree: a willful act char-

acterized by the presence of malice aforethought and, at least ordinarily, by the specific intent to kill, and by the absence of premeditation and deliberation.

3. Murder of the first degree: a willful act characterized by the presence of malice aforethought and by a deliberate and premeditated intent to kill, or by one of the means, or by the perpetration or attempt to perpetrate one of the felonies, enumerated in the statute.

It is patent that the homicide in this case can be murder of the first degree only if it is shown to have been deliberate and premeditated. To appraise the legal sufficiency of the evidence to sustain the verdict it is therefore necessary to know what is meant by the terms ''deliberate'' and ''premeditated.''

As hereinbefore suggested the plaintiff contends, in effect, and the trial court so instructed the jury, that to sustain the verdict of first degree murder there need be shown *''no appreciable* space of time between the intention to kill and the act of killing—they may be as instantaneous as successive thoughts of the mind''; that ''A man may do a thing willfully, deliberately and intentionally from a *moment's* reflection as well as after pondering over the subject for a month or a year''; that ''He can premeditate, that is, think before doing the act, *the moment he conceives the purpose,* as well as if the act were the result of long preconcert or preparation.'' (Italics added.) If this contention be correct —if an act is deliberate and premeditated even though it be executed in the very moment it is conceived, with absolutely ''no appreciable'' time for consideration—then it is difficult to see wherein there is any field for the classification of second degree murder.

Of course the instruction that there need be ''no appreciable space of time between the intention to kill and the act of killing . . .'' is abstractly a correct statement of the law. It will be properly understood (at least upon *deliberation*) by those learned in the law as referring only to the interval between the fully formulated intent and its execution, *and as necessarily presupposing that true deliberation and premeditation characterized the process of, and preceded ultimate, formulation of such intent. (People* v. *Thomas* (1945), *supra,* 25 Cal.2d 880, 900.) But holding that such declaration is a correct statement of the abstract principle of law is not a holding that the same declaration made to a jury without explanation is not error. Particularly is it mislead-

ing when read in the context in which it was used. It excludes from the required showing any deliberation and premeditation between the intent and the act of killing and since other portions of the instruction eliminate any necessity for deliberation or premeditation in forming the intent ("He can premeditate . . . the moment he conceives the purpose," etc.), we find that the court has wholly deleted the only difference, in this type of case, between first and second degree murder.

 It is asserted that "There is nothing in the sections of the Penal Code which relate to this subject, which indicates that the Legislature meant to assign any particular period to this process of deliberation or premeditation, in order to bring the act within the first degree." This latter assertion is eminently correct. (See *People* v. *Thomas* (1945), *supra,* 25 Cal.2d 880, 900.) But likewise there is nothing in the sections of the Penal Code which indicates that the Legislature meant to give to the words "deliberate" and "premeditate" any other than their common, well-known dictionary meaning.

The adjective "deliberate" means "formed, arrived at, or determined upon as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on coolly and steadily, esp. according to a preconceived design; . . . Given to weighing facts and arguments with a view to a choice or decision; careful in considering the consequences of a step; . . . unhurried; . . . Characterized by reflection; dispassionate; not rash." (Webster's New Int. Dict. (2d ed.).) The word is an antonym of "Hasty, impetuous, rash, impulsive." (Id.) It has been judicially declared that "Deliberation means careful consideration and examination of the reasons for and against a choice or measure." (*People* v. *Richards* (1905), 1 Cal.App. 566, 571 [82 P. 691].) The verb "premeditate" means "To think on, and revolve in the mind, beforehand; to contrive and design previously." (Webster's New Int. Dict. (2d ed.).)

The jury were not given any of these quoted definitions of the words "deliberate" or "premeditate." Instead they were told by way of definition and explanation that deliberation and premeditation required "no appreciable space of time between the intention to kill and the act of killing—they may be as instantaneous as successive thoughts of the mind"; that a man "may do a thing . . . deliberately . . . from a moment's

reflection as well as after pondering over the subject for a month or year''; that he ''can premeditate . . . the moment he conceives the purpose, as well as if the act were the result of long preconcert or preparation.'' Under that instruction, if it be the law, a jury could find a man guilty of first degree murder and we would have to affirm it, if the circumstances showed that two life-long friends, who never before had quarreled, who were hunting companions and lovers of firearms, sat down at a table to clean their weapons, engaged in friendly discussion, suddenly quarreled, and one, who never before had had but kindly thoughts for his friend, precipitately, in the twinkling of an eye, ''the moment he conceives the purpose,'' with ''no appreciable space of time between the intention to kill and the act of killing,'' in the anger of the moment slew his friend. Excluding such great provocation as would reduce the offense to manslaughter those circumstances would show implied malice aforethought and the specific intent to kill; i. e., second degree murder (punishable by imprisonment in a state prison from five years to life), but we think that such a slaying was never intended by the Legislature to be placed in the same class with murder which is truly cold-blooded (deliberated and premeditated) or which is committed ''in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem,'' or ''by means of poison, or lying in wait, [or] torture.'' (Pen. Code, § 189.)

We do not undertake to say, as a matter of law, how long a thought must be pondered before it can be said to be deliberated and premeditated. That is fundamentally a question of fact for the jury in each case under proper instructions. But it is our function to require the trial courts and prosecuting officers to abide by the standards ordained by the statute and to that end to examine the instructions given, as to their compliance with the law, and the evidence, for its legal sufficiency to sustain any essential finding.

The words ''deliberate'' and ''premeditate,'' as above shown, have clearly defined and commonly understood meanings. In view of such commonly understood meanings it might not be necessary, at least in the absence of a request therefor, for the trial court to instruct the jury at all on the significations of those words, but when it does undertake to define or describe their significativeness any definition or description given should be fair and complete. For example, the jury may be told that ''Neither the statute nor the court undertakes to measure in units of time the length of the period dur-

ing which the thought must be pondered before it can ripen into an intent which is truly deliberate and premeditated. The time would vary with different individuals and under differing circumstances. The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly, but the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides (not specifically enumerated in the statute) which are the result of mere unconsidered or rash impulse hastily executed." (*People* v. *Thomas* (1945), *supra,* p. 900 of 25 Cal. 2d.) But if they are instructed in that vein, which emphasizes the rapidity with which thoughts may follow each other, fairness requires a further instruction placing at least equal emphasis on the true (see definitions above) meaning of the terms. In other words, while the jury may be told that the brain can function rapidly they must not be misled into thinking that an act can at the same time be hasty, hurried, and deliberate, or impulsive, unstudied, and premeditated. The extent of the reflection in every case, if it is to pass the test, must fairly and reasonably meet the ordinary and unquestioned significations of the test words.

It is irrefragable that (in cases of the type now before us) the statutes of California purport to authorize putting a person to his death only where his act of killing was truly deliberate and premeditated; i. e., was murder of the first degree. If we were to uphold a finding of first degree murder, and consequentially imposition of the death penalty, in cases where (as here) the jury have been authorized to believe that neither deliberation nor premeditation, in any commonly understood meaning of those words, need be shown, we should gravely augment the applications of that penalty. Executions in such cases would be by authority of law only because we so held— not because the language of the statute upon any meaning defined either in the statute or in any standard dictionary so provided.* Although, as pointed out in *People* v. *Holt*

---

*The ordinary dictionary definitions are given *supra,* p. 183. Paragraph 16 of section 7 of the Penal Code declares that "Words and phrases must be construed according to the context and the approved usage of the language; but technical words, and phrases, and such others as may have acquired a peculiar and appropriate meaning in law, must be construed according to such peculiar and appropriate meaning." Legal usage ordinarily follows the dictionary definitions. See 26 C.J.S. 689-692; 40 C.J.S. 886-889, § 33.

(1944), *supra,* 25 Cal.2d 59, 84-89, there have been inconsistencies in the interpretations and applications of the statute sufficient to establish precedents for varying views, we deem it preeminently our duty not to seek to extend the statute but rather to understand it and give it effect as written by the Legislature.

In the light of this discussion the definition and explanation of the words ''deliberate'' and ''premeditate'' given by the trial court as above set forth, under the circumstances of this case, must have been misleading to the jury and would require reversal of the judgment except for the fact that such error affects only the degree of the crime, which error, in view of the disposition we make of the case, becomes immaterial.

In considering the sufficiency of the evidence to support the verdict of first degree murder it is proper to observe that, just as the jury rejected defendant's testimony that he was not present when deceased was killed, they could reject any portion of the testimony bearing on the degree of the murder which they found unworthy of credence, and they could draw reasonable inferences from the testimony they did believe, as related to the other evidence. ''But as is true as to all factual issues resolved by a jury, the evidence upon which the determination is made is subject to review on the question of its legal sufficiency to support the verdict. To the extent that the character of a particular homicide is established by the facts in evidence the jury is bound, as we are, to apply the standards fixed by law. 'The discretion of jurors in considering the effect of evidence as proof is not absolute. It is their duty to avoid fanciful theories and unreasonable inferences and not to resort to imagination or suspicion.' [Citation.]'' (*People* v. *Holt* (1944), *supra,* 25 Cal.2d 59, 90.) Mere conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof. An inference must be ''warranted by a consideration of the usual propensities or passions of men, [or] the particular propensities or passions of the person whose act is in question. . . .'' (Code Civ. Proc., § 1960.)

Since there is no substantial evidence from which it reasonably can be inferred that defendant either formed or carried out the intent to kill deliberately, and with premeditation, in the ordinary meaning of those words, the judgment upon the finding of murder of the first degree cannot

be sustained. The evidence, however, amply supports the other findings necessarily implied in the verdict of the jury. The error in instructing as to the degree of the homicide does not enter into the finding that defendant is guilty of "the unlawful killing of a human being, with malice aforethought" (Pen. Code, § 187) and there were adequate instructions on the subject of manslaughter.

For the reasons above stated the judgment is modified by reducing it to murder of the second degree and as so modified is affirmed. The cause is remanded to the trial court with directions to pronounce judgment on defendant sentencing him to imprisonment in a state prison for the term prescribed by law for murder of the second degree.

Gibson, C. J., Carter, J., and Traynor, J., concurred.