[Crim. No. 5387. Second Dist., Div. Three. Nov. 9, 1955.]

THE PEOPLE, Respondent, v. JOHN LE ROY
WALES, Appellant.

C. Ransom Samuelson and Clarence Hengel for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant was charged with the crime of abortion. In a trial by jury he was found guilty. Probation was granted on condition that he serve 90 days in the county jail, and proceedings were suspended. Defendant appeals from the judgment (order granting probation) and from the order denying his motion for a new trial.

Appellant contends that the evidence is insufficient to sustain the conviction; and that the court erred prejudicially in refusing to give certain instructions.

Mrs. Malone (upon whom the abortion was allegedly performed) testified in part as follows: She had a physical examination by Dr. Dach who stated that he believed she was pregnant. He told her to come back the following Saturday for a more thorough examination. She did not go back for the examination. About June 10 she talked to a man friend, by the name of Lionel, about an abortion, and he gave her the name of defendant. On June 16 she telephoned defendant's office and made an appointment to go there on June 17. At the time appointed she went to defendant's office and asked defendant to examine her to determine whether she was pregnant. She gave him information about her physical condition, age and family history. She was placed in a chair which was equipped with stirrups. The

chair was then let down like a table, and she was in a "lying position." Defendant made a manual examination, using a vaginal speculum, which took about 10 minutes. He stated that it looked like she was pregnant. She told him that she could not have the baby because she was not married, and she asked him to help her. He asked her if she "would keep quiet," and she said "Yes." He then made an appointment for her to return at 11 a. m. on Saturday (June 19), and told her that she would be in his office about an hour and a half. She asked how much it would be, and he said $200—and to bring it in cash. He told her to bring a sanitary belt. On Saturday, about 11 a. m., her friend Dorothy took her in an automobile to defendant's office, and Dorothy said that she would return at 12:15 o'clock. She (witness) entered the office. Defendant was in his private office with the door open, and no one else was present. He asked her for the money. She told him that she was able to get only $175, and she handed the money to him. He returned $5.00 to her and said that she might need it. He did not give her a receipt for the money. He told her to go into the dressing room, remove her clothes except certain things, put on the sanitary belt and a dressing gown and then come into the examining room. After she complied with those directions, he placed her in the chair in approximately the same position she was in when he examined her, placed her legs in the stirrups, and put a sheet over her. Then he gave her a hypodermic injection in the arm. He said that the injection was a drug which was used for women who were beginning labor, to make them relax. He pulled a small table over by her. Defendant sat between her feet, at the end of the table, and, with his hands and instruments, contacted her uterus and vaginal tract. She felt a scraping sensation in her pelvic tract. Defendant said he "was scraping it out." She told him it hurt, and she cried a little. He worked on her in this manner about 30 minutes. The hypodermic injection had a relaxing effect but she was fully conscious. After defendant completed what he was doing, he carried out an oblong pan which contained "blood clots, or whatever it was." He helped her into the dressing room, and told her to lie down. He gave her an injection in the hip, and told her it was penicillin which would stop any infection. She lay there about 25 minutes, and then she dressed. Defendant told her to take aspirin if she had pain like menstrual cramps. He said there would be "spotting" for a few days then she

would be over her pregnancy. He told her to come back if she wanted further examination to see if everything was all right. Dorothy came after her and took her home. On Sunday she was in considerable pain. On Monday the pain was worse and by Wednesday night (June 23) it became unbearable. She called Dr. Brown's office but he was not in, and Dr. Posson came to see her. She told him that she had an abortion, and he examined her. He told her that she should go to the hospital for further examination, and for her to see Dr. Brown. She saw Dr. Brown the next day, and he examined her and gave her medical treatment.

Dr. Posson, called as a witness by the People, testified that he is an osteopathic physician. He examined Mrs. Malone on June 23. She said that she had something done about a possible pregnancy. From her history and the (his) findings, he thought she had been pregnant or was pregnant. He formed an opinion, based upon her history, that she had been aborted or was miscarrying. Her temperature was a little below normal and he did not think that she had an infection. She was having cramps, bleeding and clots.

Dr. Brown, called as a witness by the People, testified that he is an osteopathic physician. On June 24 he gave Mrs. Malone an examination. She told him that she had been pregnant and had been aborted. Her uterus was slightly enlarged, boggy and soft which, with her history, indicated that she had been recently pregnant. There was slight bleeding from the cervix but there was no infection there. He came to the conclusion, based upon his objective physical findings, that she had aborted. He treated her until July 22. On cross-examination he testified that Mrs. Malone told him that she was aborted in a doctor's office, and that the doctor had used some instrument on her. He (witness) examined her cervix for marks or scars, and found none. If an instrument has been used to procure an abortion, generally there are marks on the cervix five days thereafter. Excluding the history which Mrs. Malone gave him, he would assume that she had been aborted but he would not definitely know, and he would not know whether the abortion was spontaneous or induced.

Dr. Dach, called as a witness by the People, testified that he specializes in obstetrics and gynecology. He examined Mrs. Malone on May 19, 1954. He made an examination of the uterus and cervix of her vaginal tract by using a speculum. He also made a digital and bimanual examination. After

he completed the examination, he was of the opinion that she was pregnant—about seven weeks pregnant.

Dorothy, called as a witness by the People, testified that Mrs. Malone told her that she was pregnant and had an appointment with defendant on Saturday (June 19) for the purpose of having an abortion performed. On June 19 she took Mrs. Malone in an automobile to the building where defendant's office was located. About 12:10 p. m., she (witness) went to defendant's office and saw defendant and Mrs. Malone in the "inner" office.

Officer Thiele testified that he and Officer Finch went to defendant's office on June 29. They looked through the appointment book, went through all the files and made a search of everything "in the way of a record" but could not find the name of Mrs. Malone. Finch told defendant that they (officers) were there regarding a criminal abortion—that defendant was the suspect and Mrs. Malone was the victim. Defendant stated that he did not know anyone by that name and that he had not performed any abortions. After further conversation with defendant, defendant said, "Couldn't I give the girl back her money and take care of her medical expenses?"—that he would rather pay her what the officers said she had lost than to take the publicity that would follow his arrest. They took defendant to the police station where they had a further conversation with him. Defendant asked them if they could not "fix it up with the district attorney so that he could pay a fine," and would not be prosecuted. He also said, "Well, couldn't I go through you and you pay the girl off so that I won't be arrested?" Officer Finch told the defendant that all they wanted was the truth. Defendant then replied, "If I do tell the truth, what can you do for me, what can you guarantee me?"

Officer Finch testified in substance the same as Officer Thiele had testified.

Defendant testified that he is 74 years of age, and has been a physician and surgeon since 1914. He gave Mrs. Malone a bimanual physical examination on June 17. She told him that she thought she was pregnant, and he replied that there was a little swelling on the right side of the uterus but that there was no evidence of pregnancy. She asked him how much he would charge to take care of her during her confinement, and he stated that most obstetricians were charging $250, but that if she would pay in advance he would take care of her for $200. He told her to wait a

week and come back for a rabbit test and they would know for sure whether she was pregnant. She said that she would talk to her husband and would probably be back. The following Saturday (June 19) she returned and said that she had "quite a little pain." He examined her, and the cervix and the vault of the vagina were inflamed and red, and there was a little mucus. He decided that she had some infection. He attached a piece of cotton to an applicator and, using an antiseptic, he swabbed the cervix and the vault of the vagina. Then he gave her terramycin to stop the infection. He had her lie on the bed in the dressing room, and gave her penicillin. When she left, he told her to come back in two or three days for a rabbit test, and that if she did not feel better to come back the next day. She did not come back. He did not abort her. She gave him $175 on Saturday, and he returned $5.00 to her. He stated that they would settle the balance of $30 when he completed his diagnosis. He did not give her a receipt for the money because he did not expect to need all of it for he was not sure that she was pregnant. His secretary keeps all his records, but she was not at the office Saturday. When she is absent, he makes notes and she later makes the entries in the books. He did not make a note of Mrs. Malone's visit because he wanted a rabbit test so he would know what his diagnosis might be. When he talked with the officers at the police station he did not know Mrs. Malone by name, but he remembered her when he saw her at the preliminary hearing.

Dr. Gates, called as a witness by defendant, testified that he specializes in gynecology and, until two years ago, he also specialized in obstetrics. Without a history of an abortion, a slightly boggy, enlarged uterus with bleeding would be no positive evidence that an abortion had been performed. Five days after an abortion has been performed, he would expect to find abrasions or scars in the mouth of the uterus—the cervix has to be grasped (in performing an abortion) with a tenaculum, an instrument with sharp claws that will leave a mark.

 "An essential element of the crime [of abortion] is a criminal intent on the part of the accused to procure an abortion, and such intent must be specific. The requisite guilty intent cannot exist unless the defendant has actual knowledge or actually believes that the woman is pregnant, since the intent must be to procure a miscarriage. However, it is the belief and purpose of the defendant which is involved,

not whether pregnancy in fact exists." (1 Cal.Jur.2d 159, § 10.) Whether defendant believed that Mrs. Malone was pregnant would, of course, have an important bearing on the question of his intent. Section 21 of the Penal Code provides that "The intent or intention is manifested by the circumstances connected with the offense. . . ." ██ Some of the circumstances herein, relating to the question of intent on the part of appellant to procure an abortion, were: Mrs. Malone was about seven weeks pregnant, according to testimony of Dr. Dach; appellant told her (according to her testimony) that "it looked like" she was pregnant, and he asked her if she would keep quiet if he helped her; he told her (according to her testimony) that he was scraping "it out," and that she would be "spotting" for a few days and then she would be over her pregnancy; payment of $170 cash to defendant for which he gave no receipt; absence of her name upon his records; she had been aborted or was miscarrying, according to testimony of Dr. Posson; she had been pregnant and had been aborted, according to testimony of Dr. Brown; defendant told the officers that he did not know anyone by the name "Malone," and he asked them if they could "fix it up" with the district attorney, and what they could guarantee him if he told the truth. Appellant denied that he performed an abortion. He also testified to the effect that when he examined Mrs. Malone there was no evidence of pregnancy; he treated her for an infection; the money was to pay for taking care of her during her confinement in the event she was pregnant; he did not give her a receipt for the money because he did not think he would need all of it. There was also testimony of Dr. Gates (on behalf of appellant) that, in performing an abortion, the cervix has to be grasped with the sharp claws of an instrument which leave marks; and that he would expect to see the marks five days after the abortion had been performed. Also there was testimony by Dr. Brown (witness called by the People) to the effect that if an instrument had been used, generally there would be marks on the cervix five days thereafter; and he examined her cervix for marks and found none. Viewing the evidence in the light most favorably to the People, it was legally sufficient to support the conviction.

██ Appellant argues further that the corroborative evidence herein was as compatible with innocence as it was with guilt. Whether such evidence was as compatible with innocence as it was with guilt was a question for the trier of fact.

(See *People* v. *Allen,* 104 Cal.App.2d 402, 412 [231 P.2d 896]; *People* v. *Estes,* 99 Cal.App.2d 745, 747 [222 P.2d 454].) ■ A defendant may not be convicted of the crime of abortion upon the testimony of the woman upon whom the offense was committed unless she is corroborated by other evidence. (Pen. Code, § 1108.) **[5]** It could be inferred from the evidence herein, exclusive of the testimony of Mrs. Malone, that appellant believed that Mrs. Malone was pregnant, and that he intended to procure an abortion. It therefore appears that such evidence was legally sufficient to corroborate her testimony. Appellant relies upon *People* v. *Murphy,* 60 Cal.App.2d 762 [141 P.2d 755], wherein it was held, as a matter of law, that the corroborative evidence was insufficient to establish that defendant believed that the prosecutrix was pregnant; and that the corroborative circumstances were as compatible with innocence as they were with guilt. In the present case it cannot be said, as a matter of law, that the corroborative evidence was insufficient to establish that defendant believed that Mrs. Malone was pregnant.

■ Appellant contends further that the court erred prejudicially in refusing to give certain instructions (Nos. 19 and 27),[1] requested by appellant, to the effect: (1) When the evidence is susceptible of two reasonable interpretations—one pointing to guilt and one to innocence—it is the duty of the jury to adopt the interpretation pointing to innocence; and (2) a verdict of guilty may not be based upon circumstantial evidence alone unless the proved circumstances are consistent

---

[1]No. 19—"'Where the facts of the case, considering the evidence as a whole, are susceptible of two reasonable interpretations, one looking toward the guilt and the other toward the innocence of the defendant, it is your duty to give such facts and the evidence the interpretation which makes for the innocence of the defendant, rather than to adopt the one looking toward his guilt.

"'If there is any reasonable hypothesis based upon the consideration of the whole evidence in this case, then it is your duty to adopt such hypothesis, and to find him not guilty; for it is your duty not to look for some theory upon which you can convict the defendant, but, on the contrary, it is your duty, and the law requires you, if you can consistently and reasonable do so, to reconcile any and all circumstances and the whole evidence of the case that have been shown with the innocence of the defendant, and if by doing so, the innocence of the defendant appears, or if a reasonable doubt of his guilt arises, the jury must acquit him.''

No. 27—"'I instruct you further that you are not permitted, on circumstantial evidence alone, to find the defendant guilty of the [any] crime charged against him unless the proved circumstances not only are consistent with the hypothesis that the defendant is guilty of the crime, but are irreconcilable with any other rational conclusion.''

with the hypothesis of guilt and are irreconcilable with any other rational conclusion. Appellant asserts that circumstantial evidence was substantially relied upon herein for proof of guilt; and that the requested instructions were necessary to enable the jury to properly consider the circumstantial evidence. The theory of the prosecution was that appellant believed that Mrs. Malone was pregnant, and that he intended, by the acts performed by him, to procure an abortion. The theory of the defense was that appellant did not believe that Mrs. Malone was pregnant, and that he treated her for an infection and he did not intend to procure an abortion. Such theories, of course, required a determination of appellant's belief and intent. It is clear that, in the matter of determining his belief and intent, the prosecution relied substantially upon circumstantial evidence.

In *People* v. *Yrigoyen,* 45 Cal.2d 46 [286 P.2d 1], wherein defendant was charged with issuing a check with intent to defraud, the prosecution relied upon circumstantial evidence to show criminal knowledge and intent. In that case a judgment of conviction was reversed for failure to give an instruction embodying the principle "that to justify a conviction on circumstantial evidence the facts and circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion." It was said therein (p. 52): "[W]e declared in *People* v. *Bender,* 27 Cal.2d 164, 174 et seq. [163 P.2d 8], that the court on its own motion must give an instruction embodying the principle that to justify a conviction on circumstantial evidence the facts and circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion." It was also said therein (p. 52): "It is true that in the Bender case proof of guilt was entirely circumstantial, whereas in the present case there was direct evidence that defendant issued the check without sufficient funds in or credit with the bank, and *circumstantial evidence was relied upon to show his criminal knowledge and intent.*" (Italics added.)

In *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8], it was also said (p. 175): "It cannot be too strongly emphasized that such quoted statement [referring to statement to effect that circumstantial evidence must not only be consistent with theory of guilt but must be inconsistent with any other rational conclusion] enunciates a most important rule governing the use of circumstantial evidence. In unequivocal language it

should be declared to the jury in every criminal case wherein circumstantial evidence is received.''

In *People* v. *Candiotto,* 128 Cal.App.2d 347, 355-356 [275 P.2d 500], it was held that such an instruction must be given when criminal knowledge is shown only by circumstantial evidence.

In *People* v. *Hatchett,* 63 Cal.App.2d 144 [146 P.2d 469], it was said at page 155: ''Neither the statement in an instruction that the guilt of the defendant must be established beyond a reasonable doubt, nor the statement that as between two opposing reasonable inferences the one which is consistent with innocence must be preferred to the one tending to show guilt, satisfies *the right of the defendant to have the jury instructed that where circumstantial evidence is relied upon by the People it must be irreconcilable with the theory of innocence* in order to furnish a sound basis for conviction.'' (Italics added.)

In the present case the trial judge erred prejudicially in refusing to give an instruction embodying the principle that to justify a conviction on circumstantial evidence the facts and circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion.

With reference to appellant's requested instruction Number 19 (regarding two reasonable interpretations of the evidence), it appears that some words have been omitted from the first part of the second paragraph. It is there stated: ''If there is any reasonable hypothesis based upon the circumstances of the whole evidence in this case, then it is your duty to adopt such hypothesis. . . .'' Of course, the trial judge was not required to give that incomplete instruction. In *People* v. *Bender, supra,* 27 Cal.2d 164 [163 P.2d 8], it was said at page 177: ''They [jury] were told that 'If the evidence in this case is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant's innocence, and reject that which points to his guilt.' This instruction is eminently *proper as far as it goes. To it should have been added a direct statement of the precise principle* under discussion [the principle that where circumstantial evidence is relied upon for proof of guilt it must be irreconcilable with the theory of innocence].'' (Italics added.) ██ As indi-

cated in the Bender case, *supra,* it would have been proper to give an instruction embodying the principle stated in the first paragraph of said instruction Number 19—regarding two reasonable interpretations of the evidence.

In view of the above conclusion, it is not necessary to discuss appellant's other requested instructions (Nos. 20 and 21—pertaining to circumstantial evidence) which were refused.

The judgment (order granting probation), and the order denying the motion for a new trial, are reversed.

Shinn, P. J., and Ashburn, J. pro tem.,* concurred.

A petition for a rehearing was denied November 21, 1955, and respondent's petition for a hearing by the Supreme Court was denied December 8, 1955. Shenk, J., Edmonds, J., and Spence, J., were of the opinion that the petition should be granted.

*Assigned by Chairman of Judicial Council.