[Crim. No. 3957. Second Dist., Div. Three. Mar. 21, 1946.]

THE PEOPLE, Respondent, v. DORIS LOVELLA REID, Appellant.

Harry B. Ellison and Cobb & Utley for Appellant.

Robert W. Kenny, Attorney General, and Henry A. Dietz, Deputy Attorney General, for Respondent.

DESMOND, P. J.—Appellant, in a jury-waived trial, was found guilty of the murder of William Kenneth Strang. She contends on this appeal that the element of malice was lacking in her perpetration of the crime; that therefore her conviction of second decree murder should not stand and urges this court to modify the judgment by reducing the offense to manslaughter "in the light of all the evidence in this case." We have read the transcript and see no reason to disturb the finding of the trial court. Nor is it necessary or desirable in settling the point raised by appellant to recount in detail the unsavory testimony of all the circumstances leading to and culminating in the tragedy which sent a human soul all unprepared into eternity. It will be sufficient to refer to a few of the incidents which stand out in bold relief and, particularly, to the manner in which the deadly attack was made, first by a stab wound in the back, followed by a fatal stab wound in the chest as deceased turned and twisted in an effort to escape.

This appellant, while married to Harold Reid and making her home with him, received the attentions and frequent amorous embraces of the deceased for a period of several months prior to May, 1945. They both lived in Torrance and on Thursday, May 3, 1945, appellant, at the request of the deceased, left her own home and went to his. She had done this occasionally during their acquaintance. She stayed until the following Sunday. On that afternoon she and deceased went for an automobile ride in the Palos Verdes hills returning to Strang's home toward evening where appellant undertook to prepare a rabbit dinner. When the meal was almost ready Strang's divorced wife and a Mrs. Vaught drove up to the house to make some inquiry about turkeys, saw and talked with Strang and were about to drive away when Strang urged them to come in and stay for dinner. Appellant was introduced by deceased to his former wife and Mrs. Vaught and she joined in extending the invitation to dinner. However,

she did not set the table or join the others where they ate. Instead, she took a meal to Strang's father in another room. Several drinks were served during the evening and Strang danced with some of the women including his ex-wife to whom he was quite, attentive.

After dinner adjournment was taken to a nearby bar, known as the Verplais Cafe, the party traveling in Mrs. Vaught's coupe. Mrs. Vaught drove the car, appellant sat in the middle and Mrs. Strang sat in the lap of her former husband. When they arrived at the bar shortly before midnight, the appellant noticed two men standing at the rear of the establishment. She recognized them but did not know their names and when she went to the rear bought them each a drink, while the deceased and the other two women ordered their drinks near the front of the bar. Shortly thereafter appellant stepped out the rear door into an alley but the deceased went after her and caused her to return. As the party later left the cafe through the front door the appellant informed her companions that the two men for whom she had purchased the drinks had extended an invitation to come to their apartment for a few more drinks, but the invitation was declined by Mr. and Mrs. Strang and Mrs. Vaught. The Verplais Cafe is located across the street from the Torrance Police Station. Mrs. Vaught's coupe had been parked in a nearby parking lot half a block away and while the four members of the party, that is, the appellant, the deceased and the other two women were on their way to the Vaught automobile, the appellant met the two men for whom drinks had been bought and stopped and talked with them. Finally, the deceased retraced his steps and engaged in the conversation which was very brief and the deceased and the appellant then followed Mrs. Strang and Mrs. Vaught, who had proceeded toward the coupe. When Mrs. Strang and Mrs. Vaught were getting into the coupe the appellant and the deceased were standing on the sidewalk about 20 feet away and, according to Mrs. Strang, they were discussing something. While she could not hear what was being said, from the tone of their voices they seemed to be arguing. A moment later the deceased came to the car and fell on the running board. He had been stabbed in the chest and in the back. As he approached the automobile, he said to his former wife, "Honey, she cut me." The appellant immediately followed the deceased to the car and hysterically screamed "I cut him; I cut him," endeavored

to lift him off the running board, and asked the other two women to secure aid. The appellant could not remember what happened at the time of the stabbing but she felt something warm and sticky on her hand, looked and observed the knife and the blood and saw that the deceased had a hole cut in his coat on his shoulder and assumed that she had cut him. She testified that the only thing which she remembered which could possibly be classified as an argument was her pleading with him up to the very last moment to be permitted to go home and the deceased insisting that she was not going home but would return to his house with him. After the deceased had slipped on the running board of the car in a dying condition both the appellant and Mrs. Strang ran across the street to the police station.

Officer Hill testified that the appellant arrived first and handed him the knife with which the stabbing was done. The officer stated that when he first saw appellant she was "running across the street directly toward where I was standing watching where she was running for. . . . She came running up and said, 'I cut him, I cut him.' I asked her 'Cut who?' and I couldn't get any sense out of her. All she said was 'I cut him, I cut him.' " The officer stated that he then saw the appellant running back across the street and "as I came around the corner she had Kenneth Strang and was lifting him up. I then said 'Leave him alone.' She said, 'Well, I am going to try to get him to a hospital.' I looked up and said 'I don't think he will go with you. He is dead.' "

Immediately thereafter the appellant was interviewed by Captain Ashton of the Torrance Police Department. At the trial he testified at length concerning the interview, stating among other things that "I asked Mrs. Reid why she had cut him and Mrs. Reid stated that her and Mr. Strang had had an agreement among themselves . . . that if Mr. Strang stepped out on Mrs. Reid, Mrs. Reid had the privilege of cutting Mr. Strang, and if Mrs. Reid stepped out on Mr. Strang, he had the privilege of cutting her. . . . She stated that Mr. Strang was a ship's rigger, working in the shipyards, and that he had usually always carried a heavy ship rigger's knife with him and that she didn't have any knife and that the knife in question was taken from a shelf on the back entrance of the house, at her house; that it belonged to her husband, which he had used on a fishing ship when he would go fishing; that she had showed the knife to Mr. Strang. He had seen it on

several occasions and that the knife was carried for this purpose and for this agreement that they had made up between themselves.'' This witness stated that the appellant told him that ''during the early part of the evening Mr. Strang asked his ex-wife when she was coming back to live with him, to stay with him, . . . She stated that during the evening Mr. Strang apparently was trying to get his ex-wife to come back to him and so Mrs. Reid asked Mr. Strang what he meant by doing that, was she just a stooge there; was she there to do all the dirty work and the cooking and him trying to get his ex-wife back. . . . That as the evening wore on, Mrs. Reid became angry at what was going on there . . . and she was mad because of what was going on between her friend and the ex-Mrs. Strang and that she wouldn't set the table. . . . Mrs. Strang told Mr. Strang that she had a date at Verplais Cafe and she had to go down to see if her date had arrived yet. Mrs. Reid said that Kenneth got very excited because of the fact that his ex-wife had this date and he made some remark as to who the date was with. . . . Mrs. Reid said that she told him she was going to leave and she went out on the back porch to the rear of the house, as the ladies went out the front of the house. . . . Mrs. Reid again asked him what the reason was for him trying to get his ex-wife back and he again told her that he had to be good to her. Then Mrs. Vaught and Mrs. Strang did come back to the house. They danced a few times in the house, Mrs. Reid dancing with the elder Mr. Strang, and Kenneth Strang dancing with the ex-Mrs. Strang. Along towards the end of the evening Mr. Strang suggested that they go down to the bar and get a drink. . . . As the drinks were being prepared, Mrs. Strang danced just a few steps with her husband at the bar. . . . But at the closing hour of the bar when they, that was the rest of the party, Mrs. Reid's party, were leaving by the front entrance, Mrs. Reid came out to the entrance to catch up to them and told them that her friends wanted them to go down to his apartment and have some more drinks there. The three of them, Mrs. Vaught and Mrs. Strang and Kenneth Strang, refused. . . . She stated that Mrs. Vaught and Mrs. Strang went on out of the cafe before she did, Kenneth following Mrs. Vaught and Mrs. Strang, she walking in the rear with these two men friends to the entrance. . . . As they got away from this man who had asked them to go to his apartment for a drink, Mrs. Reid told Mr. Strang that she wanted to go home and

was going home and Mr. Strang began pulling her up the sidewalk by the arm, telling her to come on up with me and talk to Lola [Mrs. Strang] ; said 'You don't want to go home,' and she began insisting that she was going home. Finally, she said 'Are you going home?' to Kenneth. He said 'No, I am not. I am going with Lola.' She started to walk back down the sidewalk and turned and again called to him 'Are you going with me?' He again replied 'No, I am not.' She then stated that she walked up to him on the sidewalk and she said 'I cut him in the back.' . . . She stated that she stabbed him in the back and I asked her how she was so certain of a cut in the back. She said because when he whirled around to walk away from her that it almost pulled the knife out of her hand and that she could see the hole in his jacket, and as he turned away from her, she stated she immediately cut him again in the chest and that he turned from her and walked into the parking lot.'' This officer was asked, ''Had Mrs. Reid been drinking prior to your conversation?,'' and answered, ''. . . She had been drinking. It was noticeable, but she was not drunk. . . . She carried on a very intelligent conversation. . . . Her speech was clear. She would go into details, didn't repeat herself to any great extent at all, and she talked for some two hours there, possibly better.''

The Chief of Police of Torrance also testified as to a conversation which he had with Mrs. Reid on the morning following the tragedy, covering many of the points testified to by Captain Ashton. In his testimony he quoted the appellant as saying that she noticed Mrs. Strang and Mrs. Vaught as they drove up to the Strang residence. ''She said 'Oh, my God, here she is,' so she said 'I immediately went to the bedroom and closed the door.' She didn't want Mrs. Strang to see her there. . . . Kenneth went over and opened the door and Mrs. Strang came in there with her and wanted to know who she was and asked her name, so they talked to her a little bit and she came out in the living room and they had a social time there, playing the radio and dancing a little, and then Mrs. Lola Strang said she had a date, she had to leave. Kenneth asked her where the date was and she said down to Verplais Cafe. So they insisted that they stay for dinner with them. After a little discussion, she said, begging them to stay, why, they said they would, so she went out in the kitchen and started getting the dinner ready. Kenneth came out into

the kitchen and Mrs. Reid said 'Kenneth, I better leave.' Kenneth said 'No, you stay right there.' She said 'Well, I think I am in the way,' so Kenneth said 'No, you are going to stay.' She said about that time Kenneth took his open hand and struck her between the eyes and it hurt her so that she cried, and Kenneth came over and told her that he was sorry and went on again into the other room. They all had dinner. She said she ate very little. She was not hungry. She took Mr. Strang's dinner into the living room and then they decided they would go down to Verplais Cafe. . . . They went down to the parking lot of Van de Kamp's, which is a couple of hundred feet away from Verplais place, went into Verplais and ordered a drink. She didn't believe that she had drank that drink that was ordered. She saw two men at the end of the bar whom she recognized. She went down there to the end of the bar and bought those two men a drink. . . . They had asked her to bring her party and come up to their apartment. She went back up to the front where Kenneth and the other two women were and asked them to go with these two gentlemen up to the apartment and they said 'No, we are going home.' They got up and started walking out and she started walking back towards the back end where the two men were. They opened the door and went out, so she came to the front door and came out the front door. They got on the sidewalk and started up the sidewalk, Mrs. Vaught and Mrs. Strang taking the lead, Kenneth and Mrs. Reid behind them. After getting past the picture show and next to the alley, these two men that had been in the back door were coming up the alley and met them on the sidewalk and they asked them again to go to their apartment and Mrs. Reid wanted to go and Kenneth said 'No, we are going home.' So Kenneth started walking away from her and she talked a few minutes with the two men and then Kenneth turned around and met her and, as he met her, she said 'I told Kenneth I would get even with him.' After that, they passed the water company's office where they had to turn in for the parking lot. From there on, her mind, she says, is blank until she got down to the car. All she could remember at that time is that he whirled and that is all she could remember. . . . I asked her at that time also whether Kenneth had his rigger's knife that had been spoken about in the report. She said she didn't see the rigger's knife. I also asked her about the statement that was made to Officer Ashton

about her carrying her knife and him carrying his knife, to be used on each other if they stepped out on each other. She said, 'Well, that was said in a joking way.' I told her I didn't think it was much of a joke to make those remarks. She said 'We just tell it in a joking way.'"

Under cross-examination the chief of police was asked, "When was it she told you that he shoved her on the shoulder?," and answered, "After they had come out of the cafe and had started up the street there, right shortly after the two men walked away he came back to her and gave her that shove there. That was the second one that evening. The first one was up in the house."

At the trial, Dr. Webb, chief autopsy surgeon of Los Angeles County, testified that the first of the two wounds suffered by the deceased was "on the upper right side of the back at the level of the upper border of the scapula. This wound had a penetration of 1 inch to $1\frac{1}{2}$ inches. The other wound, designated as Wound B, is found on the left side upper front of the chest at a point 2 inches to the right of the front median line and 7 inches below the shoulder level. This wound was three-fourths of an inch in length and had passed into the thorax, between the third and fourth left ribs, penetrating 3 inches to pass through the left side of the heart, which resulted in a profuse internal hemorrhage. Q. What did you determine to be the cause of death, Doctor? A. The immediate cause of death was stab wound of the heart."

At the trial appellant testified that while Mrs. Strang and Mrs. Vaught were gone to the Verplais Cafe, where the former had a date, "I was in the bedroom fixing myself ready to go. I went in the room, starting to get ready, and he said 'Where do you think you are going?' I said 'I am going home.' He said 'No, you are not,' and that is when he hit me in the face and I started crying and I ran out the back door and they have a kind of a tape that hooks the back screen door and I was trying to get that undone when Ken came out and he said 'If Lola comes back, tell her I will be right back.' Q. Did he catch you? A. Yes. He said, 'You are not leaving. Come on back in and have a drink and we will eat and then I will drive you home.' Q. And did he drive you home after that? A. No. Q. What happened? A. Then they came back and then everything was all ready and we dished it up. I said, 'Ken, I don't want to dish it up.' He

dished it up. I was sick; I felt too bad." Appellant further testified that while she was at the rear of the cafe with her two acquaintances and Mrs. Strang, Mrs. Vaught and the deceased were at the other end of the bar, "I looked down and seen that he was busy talking and I thought, 'Well, now is my chance to leave, and he might not see me,' so I got up and walked out and I didn't pay any attention to these fellows at all. I hadn't said anything to them and I guess they thought we were all going to go, so they up and followed me. When they got at the back door they said, 'How about going up there?' And I said, 'Ken said he didn't want to go. You will have to ask him,' and just then Ken came out the back door and grabbed me and said, 'Where are you going?' I said, 'I am going home. You promised to drive me home by 9 o'clock and it is so late now and I am going home,' and he took hold of me and said, 'No, baby; no, baby, you are not going home.' He said, 'Lola wants to talk to you.' I said, 'What does she want?' He said, 'Come in and see,' so I walked back in the back door again. . . . The two girls started off and I remember seeing them walk up the street and I told Ken to go with them. . . . Well, I remember walking up the street towards him and I don't know if I called him or what, but he came walking back to me and I said, 'Well, Ken, I am going to say goodnight to you and I am going home.' He said, 'You are not going home. You are going with me,' and I said, 'I know what is going to happen if I do go back up there and it isn't going to happen again.' He said, 'I promise you it won't,' and I said, 'You promised before.' . . . He kept quarreling at me and the next thing I remember was him coming towards me to tell me to cool off and shoved me and I don't remember any more. Q. You say he told you to cool off and he shoved you? A. Yes, he said, 'You go on home and cool off,' and he shoved me and I don't remember any more." She testified that the last time she remembered seeing the knife was in the cafe and that it was then in her purse and unopened. The appellant was asked, "Did you tell Officer Ashton that you cut him in the back first because he came very near pulling the knife out of your hand when he turned? A. I don't remember telling him that. Q. Do you recall anything like that happening? A. No. I don't remember after he shoved me." She was questioned and answered as follows: "Now, you heard Officer Ashton's testimony about you saying that you and he had an agree-

ment whereby that if he stepped out on you, you were to cut him with a knife and if you stepped out on him, he was to cut you? A. Yes, sir. Q. Did you have any such agreement with him? A. I never had an agreement like that. Q. Did you ever have any argument with the deceased about other women or other men? A. Never. When he first started saying what he would do if he caught me out with somebody, I took it more as a joke.''

Other items of evidence which were before the trial court we have not deemed it advisable or necessary to quote. They related to a condition which appellant charged to the deceased, but we are satisfied that whatever resentment she held toward him on that account would never, in itself, have caused this tragedy, although it may have contributed somewhat to the wounded feelings and highly emotional state of appellant which, in our opinion, did cause it. As Congreve has said,

> ''Heaven has no rage like love to hatred turned,
> Nor hell a fury like a woman scorned,''

and the facts of this case seem to prove it. The picture is succinctly presented in respondent's brief in the following language: ''The facts of this case show that the appellant met deceased, fell in love with him, and that they lived with each other much of the time for a period of several months. . . . That they apparently enjoyed each other's company with the exception of the periods when deceased was drinking. Both drank intoxicating liquors a great deal. Appellant knew deceased was divorced, but had never met his former wife. Deceased knew appellant was married. They agreed during their illicit love affair that should one step out on the other the abused would have the right to cut the other. Deceased carried a rigger's knife and appellant a fish knife. Appellant was so in love with deceased that she not only risked her reputation, but the wrath of her husband and also according to her, her physical health, to be with him. Up until the day of the homicide there had apparently been no cause for her to be jealous, but on that day the divorced wife of deceased entered the picture and deceased made strong efforts to have her come back to him. Appellant became angry and remonstrated with him, but he continued in his efforts. At that time the natural bent of a woman took place and she became jealous. She refused to eat with them; she left them at the bar when they went out for a drink.

Then upon the refusal of deceased to go home with her she told him she would get even with him, walked up behind him and stabbed him in the back and then in the chest. The natural, the normal, emotional feelings of a woman who had given her all to a man only to find him attempting to get another woman back to live with him would be anger and jealousy.''

■ The contention of appellant that the evidence would warrant our reducing the offense from second degree murder to manslaughter calls for consideration of the definitions set out in the Penal Code of murder, malice, the degrees of murder and manslaughter (Pen. Code, §§ 187, 188, 189 and 192). If malice is shown in the commission of a homicide the offense is murder of either the first or second degree. Section 189 of the Penal Code itemizes the various kinds of murder which are of the first degree and closes with the words ''all other kinds of murders are of the second degree.'' The trial court determined that the killing in this case was not ''wilful, deliberate and premeditated'' and for that reason decided to characterize the offense as second degree murder. In so doing he necessarily found that malice existed.

We are satisfied that the finding was within the law and as analyzed in *People* v. *Bender* (1945), 27 Cal.2d 164, at page 181 [163 P.2d 8], in the following passage: ''Murder of the second degree: a willful act characterized by the presence of malice aforethought and, at least ordinarily, by the specific intent to kill, and by the absence of premeditation and deliberation.''

The judgment is affirmed.

Shinn, J., and Wood, J., concurred.