Filed 11/17/14  P. v. Eickhoff CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064116 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE323042) |
| APRIL MERCEDES EICKHOFF, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Allan J. Preckel, Judge.  Affirmed.

Law Office of Michael P. Goldstein and Michael P. Goldstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted April Mercedes Eickhoff of one count of first degree residential burglary (Pen. Code,[1] §§ 459, 460) and one count of grand theft of personal property (§ 487, subd. (a)). At sentencing in April 2013, the trial court suspended imposition of sentence and placed Eickhoff on five years of formal probation, subject to numerous terms and conditions set forth in the probation order. Eickhoff indicated she had discussed the conditions with her attorney, and she understood and accepted them.

Eickhoff appeals, contending her convictions of both counts must be reversed but, if this court affirms her convictions, "several conditions of probation . . . need to be stricken." Specifically, she raises five main contentions. First, she contends the court erred by excluding the proffered testimony of her former codefendant Jacob Richwine's attorney, Bart Sheela, that Richwine (a defense witness at trial) had said early on in the criminal proceedings that he was solely responsible for the burglary. Eickhoff suggests that the proffered testimony of attorney Sheela was admissible under Evidence Code section 791 as evidence of a prior consistent statement of a witness.

Second, Eickhoff contends the court committed prejudicial error in failing to instruct the jury that circumstantial evidence of her mental state had to be irreconcilable with innocence in order to justify a conviction.

Third, she asserts the prejudicial cumulative effect of both the court's erroneous exclusion of "Sheela's testimony that Richwine had spoken from the beginning of his tricking his codefendants," and its erroneous "fail[ure] to instruct [the jury] that the

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

circumstantial case had to exclude rational conclusions inconsistent with guilt," requires reversal of her convictions.

Fourth, she contends that "[f]ive conditions of [her] probation [are] constitutionally invalid."

Fifth, and last, she claims CALCRIM No. 220 does not define the concept of reasonable doubt in a manner that is consistent with the requirements of federal due process.

For reasons we shall explain, we affirm the judgment.

FACTUAL BACKGROUND

A. *The People's Case*

On August 10, 2012, at 7:00 p.m., John Brunner was in the front yard of his home facing the cul-de-sac on Sugarplum Way in Ramona when he saw three White people walking in the neighborhood. One of those three people, an older woman, approached him and said she was looking for a male who had wronged her daughter and was driving a black Toyota or Subaru. While the woman was talking to Brunner, the other two people walked up a long driveway to his next door neighbor's house, which was for sale with a for-sale sign on the right side of the driveway. After the woman with whom he had spoken walked away out of view, Brunner heard the sound of an automobile engine being started. Brunner then saw a yellow SUV drive up his neighbor's driveway and into the open garage. He watched as all three people began loading things from the garage into the SUV. Brunner testified that all four doors on the SUV were open and the three

people "were rapidly shoving items into the car." Brunner ran into his house and called 911.

The recording of Brunner's 911 call was played for the jurors. Brunner told the dispatcher he thought there was "a burglary in process at [his] neighbor's house" at the end of the cul-de-sac on Sugarplum Way. He informed the dispatcher that the house was in foreclosure and the neighbors who lived there were not at home. When asked what he had seen, Brunner said that, while one lady was talking to him about looking for a "kid" in a black Subaru who had stolen something from "some girl," two other people went up a driveway, and they were "there right now," "putting stuff in their car," "digging through stuff," and "sorting through things." Brunner said the car was a bright yellow SUV and the garage was "wide open."

While watching what was happening at the neighbor's house, Brunner told the dispatcher that the yellow car had "zipped up the driveway" and "now there's three people scrounging" through the neighbor's "stuff" and "hustling and scrambling." He described the people as two White females and one White male. Brunner said that the people were "picking up things and shoving 'em in the back" of the SUV, and that "[a] guy's putting some big tool in now." The dispatcher indicated that a police vehicle was on its way and asked Brunner to stay on the line. Soon thereafter Brunner said, "Okay they're coming down the driveway." He informed the dispatcher the SUV was driving westbound on Ramona Oaks. The 911 call ended after the dispatcher told Brunner the SUV had been stopped.

4

Deputy David Knight of the San Diego County Sheriff's Department testified that on August 10, 2012, at 7:19 p.m., he and another deputy were driving in a marked sheriff's patrol vehicle when he received a call about a burglary in progress and the description of the yellow SUV. He responded to the call and located the yellow SUV traveling westbound on Ramona Oaks. As Deputy Knight and his partner, who was driving, were travelling eastbound on that divided road, they crossed over the median, activated the overhead lights, and stopped the SUV "head on." Deputy Knight testified that he contacted the three occupants, who were all sitting in the front although there were only two front seats. He identified Eickhoff as the the driver. Richwine was seated in the middle part of the front of the SUV. The third occupant, who was in the passenger seat, was Marsha Woods (Woods).[2] Deputy Knight testified that the back seat and the small storage cargo area in the back of the SUV were "completely full" of things, mostly tools. He took photographs of the contents of the SUV. The photos, which were admitted in evidence, depicted assorted tools, a 10-inch Craftsman table saw, and a tool box. The name of the burglary victim, Chris Paul, was on the tool box. A map of the area was on the SUV's front seat.

Chris Paul testified that he lived in the house on Sugarplum Way on August 10, 2012, and, when he returned home shortly after midnight that night, he discovered all of the tools in his garage were missing. Paul identified the missing property as "[a] lot of different home improvement construction type items," including power equipment, drills,

---

[2]    Woods, who was Eickhoff's codefendant, was tried with Eickhoff and also was convicted. Woods is not a party to this appeal.

5

a table saw, a drill press, a compressor, and nail guns. Paul drove to the Ramona sheriff's station where he met with Deputy Knight. There, Paul identified the 30 to 40 items that had been taken from his garage. He estimated their combined value to be between $2,500 and $3,000. Paul testified he did not know Eickhoff, Richwine, or Woods, and he never gave any of them permission to take any items from his garage.

B. *The Defense*

Woods's counsel presented the testimony of Corvan Jones, who stated that he lived in a house on Sugarplum Way and had a 27-year-old son named Alex Jones. In the evening on August 10, 2012, two females and a male arrived at his front door and asked whether Alex[3] was there. Jones did not open his front door to the strangers, but he could see them through the beveled glass. He testified the younger female, who had "a really bad attitude," said, "Is Alex here?" or "We're asking you, is Alex here[?]" Alex did not live there, and Jones grunted and walked away. Jones testified he may have said he did not know what they were talking about. He also testified he once owned a black Subaru that Alex had driven. Jones sold the Subaru in late 2011.

Eickhoff's counsel presented the testimony of Eickhoff's daughter, Samantha Sales, who lived with Eickhoff in Lakeside. Sales testified she was a friend of Woods and knew Woods and Richwine were in a dating relationship. Sales owned a 1998 Toyota Camry. Alex Jones was a former friend, she had lent her car to Alex two or three

---

3    We refer to Alex Jones by his first name to avoid confusion with his father who bears the same last name. We intend no disrespect.

6

times, and he had always returned it when he said he would. Sales testified that on August 7, 2012, Alex borrowed her car for "an hour or two," but he did not return it on time. Sales was able to reach Alex on his cell phone and he said he would return the car, but he failed to do so. Alex stopped answering her calls and texts. Over the next couple of days, Sales contacted mutual friends to see if they had seen Alex, with no success.

Sales testified that on August 10, 2012, she discussed the situation with Eickhoff. Sales did not want to call the police, and they discussed trying to contact Alex through his parents. Sales did not know exactly where Alex lived, but she knew Alex's parents had a house in Ramona Estates. Woods and Richwine were present during the conversation. Richwine knew where a former girlfriend of Alex's named Brittney Johnson lived, and he, Woods, and Eickhoff decided to contact her to try to find Alex's parents' house.

Sales also testified she found her car parked in a dirt field near her home on August 11, 2012. She acknowledged she was convicted in 2012 of receiving stolen property, a felony.

Richwine testified that Woods was his "ex-girlfriend" and that they had a child together. He testified that on August 10, 2012, he and Woods were at Eickhoff's house discussing possible ways to get Sales's car back from Alex. They drove a yellow SUV that belonged to Eickhoff's father to the Ramona home where Johnson lived with her parents. Johnson and her parents spoke to them and Johnson's mother gave them a map of the area that she had torn out of a phone book. The name of the street was Sugarplum Way, and Richwine drove the SUV there. Johnson had said the house was the second

7

house from the corner, so they got out of the vehicle and started knocking on doors. Richwine testified that at one house a man came to the door, but would not open it. The man said he did not know Alex. Richwine and Woods walked up the driveway of the next house while Eickhoff spoke to a man (Brunner) who was across the street in his front yard.

Richwine testified that when he and Woods got to the house, they knocked on the door, but nobody answered. Richwine saw some tools outside of the house. As soon as he realized no one was home, he decided to take the tools and he started putting them in piles. When Eickhoff drove up the driveway, Richwine told her and Woods that he had just been in contact with Alex and had told him they were going to take the tools to hold as collateral until the car was returned. Richwine testified that while they loaded the tools into the SUV, both Eickhoff and Woods questioned whether they had the right house and whether they were allowed to take the tools. Richwine said he assured them that he had talked to Alex and that it was okay to take the tools as collateral until he returned the car.

On cross-examination, Richwine said that on January 7, 2013, he was convicted of residential burglary for his role in this matter. He acknowledged that he had suffered another felony conviction for resisting a peace officer, and he admitted that he loved Woods and did not want her to be found guilty.

Richwine also acknowledged on cross-examination that in September 2011 he reported to law enforcement that Woods had smashed nine windows in their Lakeside

home with a metal baseball bat. About a month later, Richwine told an investigator that he was the one who had broken the windows.

Richwine further acknowledged that he and Woods had walked up the driveway together and knocked on a set of white doors that were inside the garage. Nevertheless, Richwine insisted on cross-examination that he had tricked Eickhoff and Woods into helping him steal the tools. He stated he was homeless at the time and he and Woods had spent a couple of nights at Eickhoff's house. Richwine also said he was under the influence of methamphetamine at the time of the burglary. He testified he had seen Chris Paul's name on at least two or three of the items he loaded into the vehicle.

C. *The People's Rebuttal*

In rebuttal, the People called Jose Avila, a defense investigator, to the stand. Avila testified that he interviewed Richwine on January 16, 2013, and in his written summary of the conversation he wrote: "Richwine stated that he texted several times on his cellphone, and made Woods and [Eickhoff] believe he had been in touch with [Alex]." The prosecutor asked Avila, "The word 'pretend' is not in that sentence, correct?" Avila replied, "What I meant to say here is that [Richwine] was doing the texting motions, but . . . wasn't really in contact with [Alex] or texting him."

A sheriff's detective testified she analyzed Richwine's cell phone and determined no calls or texts were sent on August 10, 2012, between 7:00 and 7:25 p.m.

9

DISCUSSION

I. *CLAIM OF EVIDENTIARY ERROR (EXCLUSION OF PROFFERED EVIDENCE OF RICHWINE'S PRIOR CONSISTENT STATEMENT TO HIS ATTORNEY)*

Eickhoff first contends her convictions of first degree residential burglary and grand theft of personal property must be reversed because the court erred by excluding the proffered testimony of Richwine's attorney, Sheela, that Richwine (a defense witness at trial) had said early on in the criminal proceedings that he was solely responsible for the burglary. Eickhoff suggests that the proffered testimony of attorney Sheela was admissible under Evidence Code section 791 as evidence of a prior consistent statement by Richwine. We conclude the court did not abuse its discretion because the proffered testimony was not admissible under Evidence Code section 791 as evidence of a prior consistent statement.

A. *Background*

As pertinent here, the felony complaint filed in this matter on August 15, 2012, jointly charged Eickhoff, Richwine, and Woods with one count of first degree residential burglary (§§ 459, 460). During the preliminary hearing held on August 30 that year, Eickhoff was represented by Andre Verdun, Richwine was represented by Sheela, and Woods was represented by Kimberly Vegas. All three defendants were held to answer. Richwine pleaded guilty to the burglary charge in January 2013.

The joint trial of the charges and allegations alleged thereafter against Eickhoff and her remaining codefendant, Woods, in the amended information began on March 26, 2013. After the prosecution concluded its case-in-chief, Richwine testified as a defense

10

witness and acknowledged on cross-examination that he had been convicted of residential burglary for his role in this matter. Acknowledging also that Woods was his former girlfriend and they had a child together, Richwine admitted that he loved Woods and did not want her to be found guilty. Later, at the conclusion of his redirect examination by Eickhoff's counsel, Richwine also testified, "I don't want to see anybody get convicted." He then indicated that neither Eickhoff nor Woods was responsible for the residential burglary.

The following sidebar exchange then occurred among the court and both defense counsel:

> "THE COURT: All right. So other than moving the exhibits into evidence, both defendants rest; correct?
>
> "[WOODS'S COUNSEL]: Back up. I think we're going to . . . call [Sheela] as a witness.
>
> THE COURT: To what?
>
> "[WOODS'S COUNSEL]: That he admitted--
>
> "[EICKHOFF'S COUNSEL]: *Prior consistent statement*.
>
> THE COURT: No, no.
>
> "[WOODS'S COUNSEL]: Okay.
>
> "THE COURT: I don't see any prior inconsistent statement that would invite [Sheela's] testimony regarding consistent statements prior to the inconsistent.
>
> "[EICKHOFF'S COUNSEL]: The inconsistent statement would be the fact that the prosecution has stated that he's a liar and that he's not telling the truth; therefore, we're allowed to bring in [a] consistent statement to show prior to his motive to lie, he was telling [Sheela] that he was the only perpetrator of this crime.

11

"THE COURT: That may be your interpretation. I don't share it. I don't see [Sheela's] testimony as being admissible.

"[WOODS'S COUNSEL]: Okay.

"[EICKHOFF'S COUNSEL]: So, Your Honor, can I just make a proffer as to what [Sheela] would testify? [¶] [*Sheela*] *would testify that during their first discussion regarding their case, and every discussion thereafter, he's maintained that* [*Richwine*] *duped the other two defendants into—*

"[WOODS'S COUNSEL]: You have to whisper.

"[EICKHOFF'S COUNSEL]: *—duped the other two defendants into helping him remove property under the guise that they had permission to do it, and in fact, he knew—he, and only he, knew that they did not have permission to take the property.*

THE COURT: All right. So offer of proof is noted. The ruling remains as given, for the reasons given." (Italics added.)

Both defense counsel then rested.

B. *Evidence Code Section 791*

Evidence Code section 791, which governs the admissibility of evidence of a prior statement of a witness that is consistent with the witness's current testimony, provides:

"Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or [¶] (b) *An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen*." (Italics added.)

12

Citing Evidence Code section 791, the California Supreme Court has explained that "[a] prior statement consistent with a witness's trial testimony is admissible only if either (1) a prior inconsistent statement was admitted and the consistent statement predated the inconsistent statement, or (2) *an express or implied charge is made that the testimony is recently fabricated or influenced by bias or other improper motive, and the consistent statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen*." (*People v. Smith* (2003) 30 Cal.4th 581, 630, original italics omitted, italics added.)

C. *Analysis*

As noted, Eickhoff and Woods's former codefendant, Richwine—who had pleaded guilty to the residential burglary at issue in this case—testified at trial for the defense that only he was responsible for that crime. Defense counsel for Eickhoff and Woods sought to bolster Richwine's credibility by introducing—as evidence of prior consistent statements by Richwine—the proffered testimony of Richwine's attorney, Sheela, to the effect that Richwine had told him during their first discussion about this case and during every subsequent discussion that only he (Richwine) was responsible for the residential burglary.

Eickhoff challenges the court's ruling that the proffered testimony of attorney Sheela was not admissible as evidence of prior consistent statements by Richwine. Citing Evidence Code section 791, subdivision (b), Eickhoff asserts the court "overlooked a basis—other than a prior inconsistent statement—for the admiss[ion] of the proffered evidence: a charge of recent fabrication."

13

However, under subdivision (b) of Evidence Code section 791, the proffered testimony of attorney Sheela regarding Richwine's alleged prior consistent statements was admissible only if "the consistent statement[s] [were] made *before* the bias, motive for fabrication, or other improper motive is alleged to have arisen." (*People v. Smith*, *supra*, 30 Cal.4th at p. 630, italics added.)

Here, the record shows that if Richwine made the proffered prior consistent statements to Sheela, he did so *after* his implicitly charged bias or motive for fabrication arose. That Richwine's trial testimony exculpating Eickhoff and Woods may have been motivated by bias, as the Attorney General suggests, is apparent from Richwine's trial testimony that Eickhoff was his friend, Woods was his former girlfriend, he and Woods had a child together, he loved Woods, and he did not want her to be found guilty. Later, at the conclusion of his redirect examination by Eickhoff's counsel, Richwine also testified, "I don't want to see anybody get convicted."

The record also shows that Eickhoff, Richwine, and Woods were arrested in this matter on August 10, 2012, and the felony complaint charging them with residential burglary was filed five days later on August 15. Although the record does not reflect when Sheela first discussed this case with Richwine, it does show he was a deputy alternate public defender who represented Richwine at the preliminary hearing on August 30, 2012. Thus, it is reasonable to conclude Sheela was appointed to represent Richwine after the felony complaint was filed on August 15, 2012, before he discussed this case with Richwine.

14

Based on the foregoing record, we conclude that Richwine's alleged motive to fabricate and assist his friend Eickhoff and his former girlfriend Woods existed at the time he made any prior consistent statements to his appointed counsel. Accordingly, we also conclude the evidence of these prior consistent statements was inadmissible under Evidence Code section 791, and the court did not abuse its discretion in excluding Sheela's proffered testimony.

## II. *CLAIM OF INSTRUCTIONAL ERROR*

Eickhoff next contends the court committed prejudicial error in failing to instruct the jury that circumstantial evidence of her mental state had to be irreconcilable with innocence in order to justify a conviction. We reject this contention.

### A. *Background*

After the last witness testified, during the brief discussion outside the presence of the jury of the proposed jury instructions, neither the court nor the attorneys for Eickhoff and Woods mentioned CALCRIM No. 224 (Circumstantial Evidence: Sufficiency of Evidence) or CALCRIM No. 225 (Circumstantial Evidence: Intent or Mental State), which the court proposed to give to the jury. At the end of the discussion, the court asked Eickhoff's counsel whether he had anything else to say about the instructions. He responded, "No, Your Honor. Thank you."

As pertinent here, the court instructed the jury under CALCRIM No. 224 as follows:

> "Before you may rely on circumstantial evidence to conclude that a
> fact necessary to find a defendant guilty has been proved, you must

15

be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that *the only reasonable conclusion* supported by the circumstantial evidence is that the defendant is guilty.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable." (Italics added.)

The court also instructed the jury under CALCRIM No. 225 as follows:

"The People must prove not only that a defendant did the acts charged, but also that she acted with a particular intent or mental state. The instructions for each crime explain the intent or mental state required.

"An intent or mental state may be proved by circumstantial evidence.  Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to conclude that a defendant had the required intent or mental state, you must be convinced that *the only reasonable conclusion* supported by the circumstantial evidence is that the defendant had the required intent or mental state.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required intent or mental state and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent or mental state was not proved by the circumstantial evidence.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

16

B. *Analysis*

Asserting that "[t]he evidence of [her] guilty knowledge and intent was entirely circumstantial"─and primarily relying on *People v. Bender* (1945) 27 Cal.2d 164 (*Bender*), disapproved on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 110─Eickhoff contends the court "committed prejudicial error by failing to instruct the jury that it could not convict [her] unless the circumstantial evidence was *inconsistent with any rational conclusion other than guilt*."[4] The Attorney General responds that Eickhoff forfeited her claim of instructional error by failing to raise it in the trial court.[5]

─────────────────

[4] Specifically, Eickhoff relies on the following language in *Bender*: "The evidence which tends to show that defendant killed his wife is entirely circumstantial. Defendant contends that, therefore, the trial court of its own motion should have given an instruction embodying the principle (as stated in [citation]) 'that, to justify a conviction, the facts or circumstances must not only be entirely consistent with the theory of guilt but must be *inconsistent with any other rational conclusion*.' It cannot be too strongly emphasized that such quoted statement enunciates a most important rule governing the use of circumstantial evidence. In unequivocal language it should be declared to the jury in every criminal case wherein circumstantial evidence is received." (*Bender*, *supra*, 27 Cal.2d at pp. 174-175, italics added.)

[5] Citing *People v. Livingston* (2012) 53 Cal.4th 1145, the Attorney General also asserts that Eickhoff's claim of instructional error fails on the merits because "the California Supreme Court has determined that [CALCRIM Nos. 224 and 225] correctly state the law regarding direct and circumstantial evidence and do not undermine the reasonable doubt standard or presumption of evidence." However, although *Livingston* did cite CALCRIM Nos. 224 and 225 with approval, it did so in rejecting the defendant's claim that CALJIC No. 2.00 (Direct and Circumstantial Evidence—Inferences) diminishes the reasonable doubt standard for direct evidence by the manner in which it differentiates between direct and circumstantial evidence. (*Livingston*, at pp. 1165-1166.) As *Livingston* did not address the same claim Eickhoff raises here, the Attorney General's reliance on *Livingston* is misplaced. (See *People v. Jennings* (2010) 50 Cal.4th 616, 684 ["'It is axiomatic that cases are not authority for propositions not considered.'"].)

17

The Attorney General also argues that, even if Eickhoff did not forfeit this claim, it fails because "the jury was properly instructed with standard CALCRIM instructions."

We conclude Eickhoff forfeited her claim of instructional error by failing to raise it in the superior court. "'Generally, a party may not complain on appeal that an instruction *correct in law* and responsive to the evidence was too general or *incomplete* unless the party has requested appropriate clarifying or amplifying language.'" (*People v. Guiuan* (1998) 18 Cal.4th 558, 570 (*Guiuan*), italics added.)

Here, the record (discussed, *ante*) shows, and Eickhoff does not dispute, that she did not object below to the jury instructions the court gave under CALCRIM Nos. 224 and 225, nor did she request any additional language to clarify or amplify those instructions, which she now claims were incomplete because they "fail[ed] to instruct the jury that it could not convict [her] unless the circumstantial evidence was *inconsistent with any rational conclusion other than guilt*." (Italics added.)

It is true, as Eickhoff points out, that "[t]he rule of forfeiture does not apply . . . if the instruction was an incorrect statement of the law." (*People v. Franco* (2009) 180 Cal.App.4th 713, 719.) Eickhoff seeks to avoid the forfeiture rule by asserting "the instructions were not correct in law." Her assertion is unavailing because she has failed meet her burden of demonstrating that the challenged instructions incorrectly state the law.

We independently review whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

18

Here, the essence of Eickhoff's claim of instructional error is her contention that the instructions the court gave under CALCRIM Nos. 224 and 225 (discussed, *ante*) incorrectly stated the law because they did not instruct the jury it could not convict her unless the circumstantial evidence was "inconsistent with any rational conclusion other than guilt."  As noted, similar language appears in *Bender*, *supra*, 27 Cal.2d at page 175.

It is true that neither CALCRIM No. 224 nor CALCRIM No. 225 contains the foregoing *Bender* language on which Eickhoff relies.  However, Eickhoff cites no authority, and we are aware of none, that requires the use of this precise language.  Furthermore, the concept that the *Bender* language─"inconsistent with any other rational conclusion" other than guilt─seeks to convey is adequately conveyed in language contained in both CALCRIM No. 224 and CALCRIM No. 225.  Specifically, the more general instruction, CALCRIM No. 224, states in part:  "[B]efore you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that *the only reasonable conclusion* supported by the circumstantial evidence is that the defendant is guilty."  (Italics added.)  CALCRIM No. 225, which specifically pertains to the sufficiency of circumstantial evidence showing the defendant had the required criminal intent or state of mind, similarly states in part:  "[B]efore you may rely on circumstantial evidence to conclude that a defendant had the required intent or mental state, you must be convinced that *the only reasonable conclusion* supported by the circumstantial evidence is that the defendant had the required intent or mental state."  (Italics added.)

The pertinent phrase contained in CALCRIM Nos. 224 and 225─"the only reasonable conclusion"─conveys the same meaning as the *Bender* phrase "inconsistent

19

with any other rational conclusion" other than guilt. Both of the challenged standard instructions convey to the jury that, "'to justify a conviction, the facts or circumstances must not only be entirely consistent with the theory of guilt but must be *inconsistent with any other rational conclusion*.'" (*Bender*, *supra*, 27 Cal.2d at p. 175, italics added.)

Accordingly, we reject Eickhoff's contention that CALCRIM Nos. 224 and 225 "were not correct in law," and we conclude Eickhoff forfeited her claim of instructional error by failing to raise it in the superior court. (*Guiuan*, *supra*, 18 Cal.4th at p. 570.)

### III. *CLAIM OF CUMULATIVE ERROR*

Eickhoff also asserts the cumulative effect of both the court's erroneous exclusion of "[Sheela's] testimony that Richwine had spoken from the beginning of his tricking his codefendants" and its erroneous "fail[ure] to instruct [the jury] that the circumstantial case had to exclude rational conclusions inconsistent with guilt" was prejudicial and requires reversal of her convictions. We reject this assertion.

"If none of the claimed errors were individual errors, they cannot constitute cumulative errors that somehow affected the . . . verdict." (*People v. Beeler* (1995) 9 Cal.4th 953, 994, abrogation on other grounds recognized by *People v. Pearson* (2013) 56 Cal.4th 393, 462.)

Here, we have concluded that both of the foregoing claims of error are unavailing. Accordingly, we reject Eickhoff's claim of prejudicial cumulative error. (*People v. Beeler*, *supra*, 9 Cal.4th at p. 994.)

IV. *PROBATION CONDITIONS*

Eickhoff next contends that "[f]ive conditions of [her] probation [are] constitutionally invalid." In fact, as we discuss, *post*, she challenges eight conditions of her probation. We conclude Eickhoff forfeited her right to challenge these probation conditions by failing to assert her challenges at the sentencing hearing.

A. *Background*

Eickhoff was on probation in another case (Super. Ct. San Diego County, 2011, No. SCE315603) when she committed her crimes in the current case in August 2012. Specifically, on December 15, 2011, she pleaded guilty in the prior case to a felony charge of using the personal identification of another to obtain $8,058 in goods in violation of section 530.5, subdivision (a). In February 2012 she was granted three years of formal probation. Eickhoff's convictions in current case constituted a violation of her probation, and the two cases were scheduled together for sentencing on April 26, 2013.

Eickhoff was 53 years of age at the time of sentencing in this matter on April 26, 2013. Eickhoff's counsel submitted a statement in mitigation on her behalf, informing the court that, "after a long period of sobriety," she suffered a "relapse on her old [methamphetamine] addiction, which caused her to make a bad series of judgment calls." Counsel indicated that following her release from custody after her arrest Eickhoff had been participating in substance abuse counseling and had passed "every test."

The probation report indicated that Eickhoff began drinking alcohol at the age of 15, and she last consumed alcohol on August 10, 2012, the date of her offense in this matter.

21

1. *Sentencing and the eight challenged conditions of probation*

At sentencing in April 2013, the court placed Eickhoff on five years of formal probation, subject to numerous terms and conditions set forth in the probation order. Eickhoff indicated she had discussed the conditions with her attorney and she understood and accepted them. Specifically, the court asked her: "Do you understand and accept probation in these cases on the conditions outlined by the Court and further discussed with you by your attorneys?" Eickhoff replied, "Yes, Your Honor I do."

Among the numerous conditions of probation the court set forth in the probation order, all of which Eickhoff accepted, are the following eight conditions that Eickhoff now challenges for the first time:

(1) Term 6.b: "Follow such course of conduct as the P.O. [(probation officer)] communicates to defendant."

(2) Term 6.e: "Comply with a curfew if so directed by the [(probation officer)]."

(3) Term 6.o: "Seek and maintain full-time employment, schooling, or a full-time combination thereof if directed by the [(probation officer)]."

(4) Term 8.b: "Do not knowingly use or possess alcohol if directed by the [(probation officer)]."

(5) Term 8.c: "Attend 'Self-help' meetings if directed by the [(probation officer)]."

(6) Term 8.e: "Take [A]ntabuse (if physically able, as determined by a licensed physician) if directed by the [(probation officer)] and continue in the program until excused. If not physically able to take [A]ntabuse, submit a written statement from physician verifying inability to do so."

22

(7) Term 8.j: "Participate in, comply with, and bear all costs associated with a continuous alcohol monitoring device if directed by the [(probation officer)]."

(8) Term 10.g: "Obtain [(probation officer)] approval as to . . . residence."

B. *Analysis*

In *People v. McCullough* (2013) 56 Cal.4th 589, 593, the California Supreme Court recently explained that, as it had "observed on numerous occasions, ""a constitutional right,' or a right of any other sort, 'may be forfeited in criminal . . . cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.""' [Citation.] 'Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal.' [Citation.] '"The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]"' [Citation.] Additionally, '[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.'"

Here, as already discussed, Eickhoff, who was on probation when she committed her current offenses, indicated at sentencing that she had discussed the new conditions of probation with her attorney, she understood them, and she accepted them. By failing to challenge the eight subject conditions of probation at the sentencing hearing, Eickhoff forfeited her right to challenge them on appeal, even on constitutional grounds. (*People v. McCullough*, *supra*, 56 Cal.4th at p. 593.)

## V. *CALCRIM NO. 220*

Last, Eickhoff claims that CALCRIM No. 220[6] does not define the concept of reasonable doubt in a manner that is consistent with the requirements of federal due process. In support of this claim, Eickhoff asserts that former CALJIC No. 290 defined proof beyond a reasonable doubt as "an abiding conviction, to a moral certainty, of the truth of the charge." Noting that CALCRIM No. 220 defines proof beyond a reasonable doubt as "proof that leaves you with an abiding conviction that the charge is true," Eickhoff complains that without the words "to a moral certainty," CALCRIM No. 220 unconstitutionally fails to tell the jurors "how convinced they must be."

We need not, and do not, reach the merits of Eickhoff's claim. As discussed, *ante*, the California Supreme Court has explained that, "'[g]enerally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.'" (*Guiuan*, *supra*, 18 Cal.4th at p. 570.)

---

6      The court instructed the jury under CALCRIM No. 220 as follows: "The fact that a criminal charge has been filed against a defendant is not evidence that the charge is true. You must not be biased against a defendant just because she has been arrested, charged with crimes, or brought to trial. [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] *Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.* The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves a defendant guilty beyond a reasonable doubt, she is entitled to an acquittal and you must find her not guilty." (Italics added.)

24

Here, the essence of Eickhoff's claim is that the CALCRIM No. 220 instruction on the concept of reasonable doubt that the court gave to the jury was unconstitutionally incomplete because it should have included the phrase "to a moral certainty" to tell the jurors how convinced of the truth of the charges they needed to be in order to conclude that the People had met their burden of proving her guilt beyond a reasonable doubt. However, the Supreme Court has recently held that the standard CALCRIM No. 220 instruction adequately defines the concept of reasonable doubt. (*People v. Aranda* (2012) 55 Cal.4th 342, 349.) As the record shows that Eickhoff did not object below to the CALCRIM No. 220 instruction the court gave to the jury, and she did not request any additional language to clarify or amplify that instruction which she now claims was incomplete, we conclude she has forfeited her claim that CALCRIM No. 220 does not define the concept of reasonable doubt in a manner that is consistent with the requirements of federal due process. (*Guiuan*, *supra*, 18 Cal.4th at p. 570; see *People v. McCullough*, *supra*, 56 Cal.4th at p. 593 [a constitutional right may be forfeited in a criminal case by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it].)

DISPOSITION

The judgment is affirmed.

                                                    NARES, J.

WE CONCUR:

BENKE, Acting P. J.

IRION, J.