Filed 5/11/15  P. v. Rojas CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  The opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050421 |
| v. | (Super. Ct. No. RIF1203892) |
| JOSE ANTONIO ROJAS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Charles J. Koosed, Judge.  Affirmed as modified with directions.

Allison H. Ting, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott Taylor, Peter Quon, Jr., and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Jose Antonio Rojas of premeditated and deliberate first degree murder (Pen. Code, § 187, subd. (a), 190, subd. (a); all statutory references are to the Penal Code) and personal use of a knife (§ 12022, subd. (b)(1)). Rojas contends substantial evidence does not support the jury's finding the murder was premeditated and deliberate. For the reasons expressed below, we agree with Rojas and modify the judgment to second degree murder.

I

FACTUAL AND PROCEDURAL BACKGROUND

In September 2012, defendant lived with his family in Perris, California. Defendant recently had begun working with his younger brother, Daniel Rojas (Daniel), and Daniel's close friend, Luis Xique, in a landscaping business.

On September 28, the men drove together to work. During the day, Daniel and Xique made plans to meet later at the Rojas residence to socialize and drink beer, but there was no evidence defendant was aware of this. After work, Daniel and defendant dropped Xique off at his residence around 7:00 p.m. and returned home. Daniel ate and drank several beers while he sat on the living room couch and watched television.

Defendant was sitting at the kitchen table eating dinner with his father when Xique arrived at the front door around 9:00 p.m. Through the open front door, Xique asked Daniel, "Where's the beer?" Defendant got up, walked over to Xique and confronted him, asking, "What did you say to me?" and "Do you want to get down?" Xique responded with something like, "You're tripping," and "I'm just asking for a beer." Daniel told defendant to "calm down." Defendant reached into his pocket for the pocketknife he always carried, then swung at or punched Xique, striking his neck and chest. Xique started bleeding and grabbed his neck, gasping for air. Daniel estimated Xique was stabbed 10 seconds to one minute after he arrived.

Daniel pushed defendant and asked, "Hey, fool. Why the fuck did you hit him, fool?" or "Why did you stab him?" Defendant's father told defendant to "Leave.

2

Leave. Get the fuck out of here." Xique walked away from the residence and crossed the street to seek help from a neighbor, but collapsed on the sidewalk. Daniel attempted to stem the profuse bleeding by applying pressure to Xique's neck while yelling for others to call for help. Xique died from his wounds.

An autopsy revealed the knife wound to the left side of Xique's neck cut a jugular vein and a carotid artery. Xique also suffered a knife wound to the left side of his chest, piercing his pericardial sac. The pathologist found no defensive wounds. Blood spatter analysis indicated Xique stood outside facing the closed screen door when defendant stabbed him.

Defendant walked away from the scene, and later placed several phone calls to his sister in San Diego, explaining he was in trouble and had done "something wrong." He asked his sister to pick him up in Tijuana, Mexico, and to give him food and money. She urged him to turn himself in to authorities.

Daniel told investigators defendant always carried a pocketknife. Daniel declared defendant stabbed Xique "for no reason," and asserted that defendant never "had a beef" with Xique. Daniel told investigators defendant also had attacked Daniel in the past for no apparent reason. Investigators found stab marks on the drywall around the window sill of defendant's bedroom.

Following a trial in May 2013, the jury convicted defendant as noted above. In July 2013, the court imposed a sentence of 25 years to life for first degree murder plus one year for use of the knife.

## II

### DISCUSSION

Defendant contends the judgment should be modified to reflect a conviction for second degree murder rather than first degree murder because there was insufficient evidence to support the jury's conclusion defendant acted with premeditation and deliberation. We agree.

3

On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.) "By definition, 'substantial evidence' requires *evidence*, not mere speculation about any number of scenarios that may have occurred.'" (*People v. Thomas* (1992) 2 Cal.4th 489, 545; *People v. Morris* (1988) 46 Cal.3d 1, 21 (*Morris*) overruled on another point in *In re Sassounian* (1995) 9 Cal.4th 535, 551, fn. 5.) "A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.'" (*Morris, supra,* at p. 21.)

"An inference is a logical and reasonable deduction or conclusion to be drawn from the proof of preliminary facts. [Citations.] . . . The strength of an inference may vary widely. In some circumstances, the preliminary facts may virtually compel the conclusion. In other circumstances, the preliminary facts may minimally support the conclusion. But to constitute an inference, the conclusion must to some degree reasonably and logically follow from the preliminary facts. If, upon proof of the preliminary facts, the conclusion is mere guesswork, then we refer to it by such words as speculation, conjecture, surmise, suspicion, and the like; and it cannot rise to the dignity of an inference. [Citations.]" (*People v. Massie* (2006) 142 Cal.App.4th 365, 373-374.)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Murder that is "willful, deliberate, and premeditated . . . is murder of the first degree. All other kinds of murders are of the second degree." (§ 189.) By dividing the offense of murder into two degrees, the Legislature attached greater moral culpability for deliberate and preconceived murders. (*People v. Holt* (1944) 25 Cal.2d 59, 90-91; *People v. Bender* (1945) 27 Cal.2d 164, 181 (*Bender*) [Legislature intended to "distinguish between deliberate acts and hasty or impetuous acts"] overruled on other

4

grounds in *People v. Lasko* (2000) 23 cal.4th 101, 110.) Thus, the Legislature never intended to place defendants who acted with the specific intent to kill in the "same class with murder which is truly cold-blooded." (*Id*. at p. 184.)

Premeditation "encompasses the idea that a defendant thought about or considered the act beforehand." (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) Deliberation """"refers to careful weighing of consideration in forming a course of action.""" (*Ibid*.) "The word 'deliberate' is an antonym of 'Hasty, impetuous, rash, impulsive' [citation] and no act or intent can truly be said to be 'premeditated' unless it has been the subject of actual deliberation or forethought." (*People v. Thomas* (1945) 25 Cal.2d 880, 901.) To find a person guilty of deliberate premeditated murder the evidence must show the defendant's acts were the result of careful thought and weighing of considerations rather than an unconsidered or rash impulse. (*People v. Banks* (2014) 59 Cal.4th 1113, 1153.) Although, the Supreme Court has observed that """"[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly""""" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069 (*Mendoza*)), the court also has declared the Legislature applied the "common, well-known dictionary meaning" to the words "'deliberate'" and "'premeditate.'" (*Bender, supra*, at p. 183.) Accordingly, the court explained "[t]he adjective 'deliberate' means 'formed, arrived at, or determined upon as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on coolly and steadily, esp. according to a preconceived design; . . . Given to weighing facts and arguments with a view to a choice or decision; careful in considering the consequences of a step; . . . unhurried; . . . Characterized by reflection; dispassionate; not rash.'" (*Ibid.*) The focus therefore is on "'the extent of the reflection,'" not the time it took before deciding to act. (*People v. Solomon* (2010) 49 Cal.4th 792, 813.)

Applying the foregoing principles has often proved difficult, however, because of the fine line drawn by the Legislature between first and second degree murder.

5

Express malice is required for one form of second degree murder, which exists "when there is manifested a deliberate intention to take away the life of a fellow creature." (§ 188.) Express malice is also required for a deliberate and premeditated murder. But a person who intentionally murders another cannot be convicted of first degree murder without substantial evidence of premeditation and deliberation. (*People v. Elmore* (2014) 59 Cal.4th 121, 133.) Juries therefore must determine whether a defendant premeditated and deliberated in "the interval between the fully formulated intent and its execution." (*Bender, supra*, 27 Cal.2d at p. 182.) This may be difficult to assess where, as here, the prosecution alleges these mental states followed in instantaneous succession.

Reviewing courts face an equally challenging task. As explained in *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), "Given the presumption that an unjustified killing of a human being constitutes murder of the second, rather than of the first, degree, and the clear legislative intention to differentiate between first and second degree murder, [a reviewing court] must determine in any case of circumstantial evidence whether the proof is such as will furnish a *reasonable foundation* for an inference of premeditation and deliberation [citation], or whether it 'leaves only to *conjecture and surmise* the conclusion that defendant either arrived at or carried out the intention to kill as the result of a concurrence of deliberation and premeditation.'" (*Id.* at p. 25.)

*Anderson* addressed this problem by providing guidelines for the kind of evidence which would sustain a finding of premeditation and deliberation, noting the evidence "falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought

6

and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Anderson*, *supra*, 70 Cal.2d at pp. 26-27.)

The Supreme Court has explained the *Anderson* framework was designed to "'assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations.'" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081.) The *Anderson* court did not intend to preclude reviewing courts from "'"" other types and combinations of evidence that could support a finding of premeditation and deliberation."'"" (*Mendoza, supra*, 52 Cal.App.4th at p. 1069.) The Attorney General, however, relies only on evidence supporting the three *Anderson* factors—planning, motive, and manner of killing—to support its argument substantial evidence shows defendant premeditated and deliberated the murder. We therefore analyze the evidence under the three *Anderson* factors.

Under the category of "planning" evidence, Attorney General contends defendant knew Xique would be coming over to the house in the evening to drink beer with Daniel. She also states defendant "made the conscious decision to get up from his seat, walk over to the front door, and confront Xique," and after "Xique explained that he was just asking for a beer, [defendant] made another conscious decision to reach into his pocket for his knife." When Daniel told defendant to "'calm down,'" defendant "made yet another conscious decision to take the pocket knife out of his pocket, unfold the knife, and then stab the left side of Xique's neck with the knife and thrust the knife deep into

7

the left side of Xique's chest." She says the "strong force [that] severed Xique's external jugular vein and carotid artery and injured Xique's pericardial sac, diaphragm, and liver shows [defendant] did not accidentally stab Xique or randomly pierce him during a struggle but rather, made precise and targeted decisions to strike Xique's most vulnerable areas of the body. Additionally, that [defendant] was neither distraught nor horrified about what he had done to Xique and did not try to help Xique afterwards, leaves no doubt that [his] decision to kill Xique was neither rash nor impulsive. [Defendant's] actions, albeit quick and successive, were clearly directed toward, and intended to result in, the killing of Xique."

In essence, the Attorney General concludes defendant planned the murder because he consciously reached for the knife in his pocket and struck the victim with the intent to kill. We agree the evidence shows defendant made a conscious decision to use his knife, but this evidence shows an intent to kill only. A defendant acts with the specific intent to kill when he assaults his victim in a manner designed to achieve the additional consequence of the victim's death. (See *People v. Atkins* (2001) 25 Cal.4th 76, 82 [specific intent defined as the intent to do some further act or achieve some additional consequence].) The Attorney General's description of defendant's conscious decision to use his knife in a manner designed to bring about the victim's death constitutes substantial evidence defendant specifically intended to kill, but does not show he carefully weighed the consequences of his act. To conclude otherwise would be nothing more than conjecture. To prove a defendant premeditated and deliberated the consequences of his action, there must be "*substantially more reflection* than may be involved in the formation of a specific intent to kill." (*People v. Thomas, supra,* 25 Cal.2d at p. 900, italics added.)

The record also does not support the Attorney General's contention defendant knew of Xique's impending visit and plan to attack Xique when he arrived. The Attorney General fails to identify any direct evidence defendant knew Daniel and

8

Xique had agreed to meet later at Daniel's house. Rather, she infers defendant knew about their plans because he carpooled to work with them. But without evidence Daniel and Xique made their plans in defendant's presence, the conclusion defendant knew of Daniel's and Xique's plans does not reasonably and logically follow from the preliminary fact that defendant carpooled to work with them. The possibility defendant knew Xique planned to meet Daniel is based on speculation and is not a substitute for reasonable and credible evidence.

The Attorney General also asserts there was motive evidence. She acknowledges "the record does not indicate the specific reason why [defendant] became angry with Xique," but nevertheless argues motive was shown because defendant "had engaged in similar behavior before. Daniel told the investigators that [defendant] always carried a pocket knife in his pocket, that [he] stabbed Xique 'for no reason,' and [he] had done the same thing before to Daniel. The fact [he] had done the 'same thing' to Daniel leads to the reasonable inference that . . . stabbing Xique was not the result of unconsidered or rash impulse."

We agree the record reveals no reason why defendant exploded in anger at the victim. The Attorney General's acknowledgment there was no evidence why defendant attacked the victim is simply another way of stating there was no evidence to show the motive for defendant's senseless act. And assuming defendant previously had assaulted Daniel, it simply does not logically follow that defendant premeditated and deliberated an assault on either occasion. Here, there was no evidence defendant harbored any animosity toward Xique before the argument and stabbing. The evidence showed he carried a knife with him "[a]lmost every day," and nothing demonstrated he was engaged in planning or activity directed toward killing Xique when he arrived. Apart from defendant's unprovoked burst of anger at the door, nothing about defendant's relationship with Xique suggests a motive to kill him.

9

Finally, as to the manner of killing, the Attorney General emphasizes defendant "deliberately stabbed two particularly vulnerable areas of Xique's body—the neck and chest.  Stabbing a person in a highly vulnerable area of the body—e.g., in the chest, as opposed to an arm or a leg—is circumstantial evidence of an intent to kill.  Thus, the evidence of [defendant's] manner of killing leaves no doubt that [his] actions resulted from thought or reflection and weighing of considerations and not unconsidered or rash impulse."

We agree the manner of killing was particular and exacting.  The issue on appeal is whether evidence of how a victim was slain supports an inference the defendant carefully weighed the consequences of his conduct before acting.  The Supreme Court has recognized that "manner-of-killing evidence is often ambiguous, and frequently cannot by itself to support an inference of premeditation" unless there is evidence of an "execution-style murder."  (*People v. Hawkins* (1995) 10 Cal.4th 920, 956-957 [evidence showed victim kneeling or crouching when the defendant fired two shots to the victim's head from a distance of three to 12 inches].)  Absent evidence of an execution-style slaying, more is required.  "Even when manner of killing evidence is strong, cases in which findings of premeditation are upheld typically involve planning and motive evidence as well."  (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1268 (*Boatman*).)

Here, there is no evidence of motive and planning.  Under these circumstances, may an inexplicable and unprovoked homicide committed in a particular and exacting fashion, by itself, demonstrate defendant premeditated and deliberated the crime?  The appellate court in *Boatman* faced the same issue.  With no evidence of planning and "no meaningful evidence" of motive, the *Boatman* court concluded no substantial evidence supported an inference the defendant premeditated and deliberated the killing of his girlfriend, despite evidence the defendant fired a gunshot approximately 12 inches from the victim's face.  (*Boatman*, supra, 221 Cal.App.4th at p. 1261, 1269.)

10

There, after being released from jail, the defendant returned home to see his girlfriend who was staying with the defendant and his family. One of the defendant's brothers heard the couple arguing shortly before the shooting. The defendant testified he and his girlfriend planned to smoke marijuana and watch a movie. After showering, he took Xanax and Norco pills, and felt disoriented. (*Boatman,* 221 Cal.App.4th at pp. 1259-1260.) While he was weighing his marijuana and counting his money, his girlfriend retrieved a gun from underneath the defendant's pillow and pointed it at him. He slapped the gun away and continued to weigh his marijuana. A mosquito landed on the girlfriend, she screamed, and he teased her by grabbing the mosquito and bringing it closer to her. He then hugged and kissed her and then returned to weighing his marijuana. The girlfriend pointed the gun at him again. He took it away from her and pointed it at her but did not intend to threaten or shoot her. She slapped the gun, which discharged when he squeezed it to keep it from dropping to the ground. He told his brother to call the police and tried to give his girlfriend mouth-to-mouth resuscitation. She said she could not breathe and he took her outside. He went back inside to get his keys, heard sirens, panicked, rinsed off the gun to remove fingerprints, tossed the gun into the bottom of a kitchen cabinet and ran outside. (*Id.* at p. 1261.) In a 911 call, the defendant could be heard saying "'[n]oooo,'" "'[b]aby,'" and "'[b]aby are you alive, baby . . . .'" (*Id.* at p. 1261.)

The forensic pathologist testified the gun was fired roughly 12 inches from the victim's head directly into her face. A criminalist testified defendant could not have fired the gun by pulling the hammer back and releasing it before it was fully cocked because of the multiple safeties on the gun. Finally, the victim sent a text message to her best friend shortly before the murder stating she wished the defendant was back in jail and she was "'fighting . . . with him right now.'" (*Boatman, supra,* 221 Cal.App.4th at pp. 1259-1261.) The appellate court concluded the manner of killing supported a finding of malice necessary to convict the defendant of murder, but there was insufficient

11

evidence of planning or motive to conclude it was an "'execution-style'" murder. *(Id.,* at pp. 1269-1270; *People v. Edwards* (1991) 54 Cal.3d 787, 814 [strong evidence of planning where the defendant drove past his two victims and turned around to follow them in his car, called out, "'Girls,'" and then, as an expert marksman who worked at a gun club, he shot one girl with a bullet between the eyes].)

The Attorney General distinguishes *Boatman* by asserting that "none of the evidence in the instant case indicates [defendant's] killing of Xique was the result of unconsidered or rash impulse." The Attorney General concludes, "Whereas the defendant in *Boatman* was distraught and tried to help his victim, [defendant] was unfazed by what he had done and neither offered Xique any assistance nor called for help. Simply stated, [defendant] coldheartedly stabbed Xique in the neck and chest and then left him there to die." The Attorney General, however, never distinguishes the requisite intent to kill from the premeditation and deliberation necessary to constitute first degree murder. Instead, the Attorney General merely assumes that absent evidence of remorse, a defendant's specific intent to kill also demonstrates premeditation and deliberation. But the absence of remorse by itself does not show a defendant weighed the consequences of a murderous act, just as the presence of remorse by itself does not show an absence of premeditation and deliberation.

*Boatman* is similar to this case because of the absence of any evidence defendant killed the victim according to a preconceived plan. Although premeditation and deliberation can occur in a brief interval, there must be substantial evidence showing defendant weighed the consequences of his actions. (*People v. Stitely* (2005) 35 Cal.4th 514, 543.) The Attorney General identifies no interval in which defendant may have reflected on a decision to kill, but instead conflates the decision to kill with premeditation and deliberation. An intent to kill and reflection on that decision are not synonymous. Nothing in the abrupt confrontation at the door suggested reflection or a preexisting design to kill. The Attorney General's claim that *Thomas* holds "even a senseless,

12

random homicide can be deliberate and premeditated" is misleading. Hewing to the distinction between an intent to kill and acting with substantial deliberation on that intent, *Thomas* declared: "'A senseless, random, *but premeditated*, killing supports a verdict of first degree murder.' (Citation.)" (*People v. Thomas*, *supra*, 2 Cal. 4th at p. 519, italics added.)

The Attorney General relies on the Supreme Court's decision in *People v. Harris* (2008) 43 Cal.4th 1269 (*Harris*). There, a mother brought her daughter to help her work the nightshift at a doughnut shop. The mother left to get supplies from another store, and when she returned her daughter could not get the door open to let her mother back into the shop. As the daughter attempted to open the door, the mother noticed the defendant waiting at the shop's service window and she told her daughter to wait on the defendant. The daughter walked to the service window, took the defendant's order, and began preparing it when she heard her mother scream. The daughter looked up to see the defendant attack and kill her mother with a large butcher knife. (*Id*. at p. 1277.) At trial, the defendant moved for a judgment of acquittal on the first degree murder charge, arguing there was no evidence of premeditation and deliberation. The trial court denied the motion and the Supreme Court affirmed, explaining the record supported a finding of premeditation and deliberation because the defendant (1) brought a butcher knife to a doughnut shop in the middle of the night when few witnesses were likely to be present; (2) stabbed the mother in the chest with enough force to completely penetrate her heart; and (3) had ample time to premeditate and deliberate as he waited at the service window, placed his order, and then moved to the door where the mother stood waiting. (*Id*. at pp. 1286-1287.)

*Harris* is distinguishable. First, the evidence showed the defendant in *Harris* planned his attack because he armed himself with a butcher knife and went to a doughnut shop in the middle of the night. Here, defendant killed Xique with a pocketknife he carried almost every day and Xique came to defendant's home, defendant

13

did not go out looking for Xique. As explained above, there is no evidence of planning in this case.

Second, the defendant in *Harris* had no reason to leave the service window to go to the door where he killed the victim while he was waiting for his order. The victim had not called out to the defendant or otherwise engaged him in any way, and there was no evidence they knew one another. The *Harris* court therefore concluded the fact the defendant waited at the service window after spotting his victim standing next to the store entrance, and had no reason to go over to the victim other than to attack her, supported the inference he made the decision to attack the victim while he stood at the service window and considered that decision as he continued to wait and then walked over to the victim's location. Here, defendant was not waiting at the table for Xique, but immediately reacted when Xique appeared and called out at the front door. This case lacks the same facts to support an inference defendant carefully considered whether to kill Xique as he sat at the table and contemplated that decision before or while walking to the front door to confront Xique. The *Boatman* court also distinguished the *Harris* decision on this latter ground. (*Boatman*, *supra*, 221 Cal.App.4th at p. 1271.)[1]

---

[1]     Our dissenting colleague asserts that answering a knock at a door and use of a pocketknife is as strong or "stronger evidence of first degree murder" than the *Harris* defendant's possession of a butcher knife when he approached his victim for no conceivable reason except to kill her. (Dis. & conc. opn., at p. 3.) We disagree. In our view, the defendant's custom of carrying a pocketknife and reaction to Xique's knock at the front door do not support an inference he carefully weighed the consequences of his acts.

The dissent also relies on the brief interval in which the offense occurred, 10 seconds to a minute, as sufficient time for defendant not only to form an intent to kill, but to consider and carefully weigh that decision. As we have emphasized, time is but one among several factors to evaluate. As observed in *Boatman,* "if the mere passage of time was enough to infer premeditation and deliberation, then virtually any unlawful killing with malice aforethought would be first degree murder because premeditation and deliberation does not require any extended period of time. [Citation.] As discussed above, premeditation and deliberation is not synonymous with malice aforethought [citation]; it requires 'substantially more reflection.' [Citation.] Clearly, there must be

14

The evidence did not support the jury's conclusion that defendant reflected or deliberated on a premeditated plan to kill. We must therefore modify the judgment.

III

DISPOSITION

The judgment is modified (§ 1260) to reflect a conviction for second degree murder and a sentence of 15 years to life, plus one year for the knife enhancement. In all other respects, the judgment is affirmed. The trial court is directed to transmit a certified abstract of the judgment as amended to the Department of Corrections and Rehabilitation.

ARONSON, J.

WE CONCUR:

O'LEARY, P. J.

---

some evidence that the defendant engaged in such reflection, and not merely had the time to do so." (*Boatman, supra*, 221 Cal.App.4th at p. 1270.)

FYBEL, J., Concurring and Dissenting.

I concur in the affirmance of the judgment but respectfully dissent from the modification reducing the degree of murder. In my view, *People v. Harris* (2008) 43 Cal.4th 1269 (*Harris*) compels us to affirm the first degree murder conviction. As I will explain, the evidence supporting first degree murder in this case is even stronger than that in *Harris*.

In *Harris*, the victim and her daughter went to work at a donut shop. (*Harris, supra*, 43 Cal.4th at p. 1277.) The victim left the shop to get supplies and, on returning, tapped on the door as a signal for her daughter to open it. (*Ibid.*) As the daughter approached the door, the victim saw the defendant standing at the service window and told her daughter to wait on him. The daughter took the defendant's order and, while preparing it, heard the victim scream. (*Ibid.*) The daughter ran to the door and saw the victim struggling with the defendant, who had a butcher knife. The victim collapsed and died. (*Ibid.*) She had a stab wound to the left side of her chest, four inches deep, which cut through a piece of one rib and completely through the heart. (*Ibid.*) The trial court, applying the sufficiency of the evidence standard, denied the defendant's motion for a judgment of acquittal as to the charge of first degree murder. (*Id.* at p. 1286.)

The California Supreme Court upheld the trial court's decision. (*Harris, supra*, 43 Cal.4th at p. 1287.) The Supreme Court stated: "Here, defendant was armed with a knife and stabbed [the victim] without provocation directly in the heart with enough force to penetrate part of a rib and pierce entirely through the heart. In the time it took for [the daughter] to go from the door to the service window, and to take and prepare defendant's order, there was ample time for him to deliberate and premeditate before attacking [the victim]. Under these circumstances, we cannot say the jury could not reasonably have found defendant guilty of first degree murder." (*Ibid.*)

1

In this case, Daniel Rojas and the victim, Luis Xique, had decided to "hang out" and drink beer after work at the Rojas home. After dropping off Xique at his home, Daniel and defendant Jose Antonio Rojas drove to their home, where they drank beer and watched television. About 40 minutes later, at about 9:00 p.m., Xique arrived and walked up to the front door, which was open. Defendant was eating at the kitchen table.

While standing at the open door, Xique asked, "where's the beer?" Defendant got up from the kitchen table, walked to the door, and asked Xique, "[w]hat did you say to me?" and "[d]o you want to get down?" Xique responded by saying, "[w]hy are you tripping?" and "I'm just asking for a beer."

Defendant pulled out a pocketknife that he carried in his pants pocket, unfolded it, and stabbed Xique directly in the carotid artery and in the chest. As in *Harris*, the stab to the chest penetrated the rib cage.

Daniel pushed defendant and asked, "[h]ey fool, why . . . did you hit him fool?" Defendant answered, "['c]ause I want to fight."

As somebody was shouting "[w]hy did you stab him? Why did you stab him," Daniel tried to help Xique, who was bleeding profusely and gasping for air. Defendant did not try to help Xique. Defendant's brother, Miguel Rojas, Jr., told defendant to "[l]eave . . . [g]et the fuck out of here." Defendant walked away from the scene and later made several telephone calls to his sister. He told her that he was in Tijuana and that he had done something wrong.

The evidence supporting first degree murder is stronger here than in *Harris* in two ways. First, defendant's comments both before and after killing Xique show that defendant did reflect on his course of action. When approaching Xique, defendant said, "[w]hat did you say to me?" and "[d]o you want to get down?" When defendant was asked afterwards why he stabbed Xique, defendant said he "want[ed] to fight." These comments support the jury's determination of premeditation and deliberation. In

2

contrast, in *Harris*, the defendant attacked the victim without comment and for no apparent reason.

Second, the manner of killing in this case is stronger indicia of premeditation than in *Harris*. (See *People v. Anderson* (1968) 70 Cal.2d 15, 26 (*Anderson*).) In *Harris*, *supra*, 43 Cal.4th at page 1277, the defendant wielded a butcher knife, which can inflict a fatal wound even if clumsily handled. Here, defendant stabbed Xique with a pocketknife. Defendant aimed the pocketknife precisely at the carotid artery and chest, where the stabs would be fatal. The stab to the chest pierced the rib cage and damaged the pericardial sac, the diaphragm, and the liver. The fact defendant carried, unfolded, and used a pocketknife to kill Xique supports the inferences of premeditation and deliberation because, to use a pocketknife to inflict fatal wounds, defendant would have had to think carefully about how to use it and where to stab the victim.

As in *Harris*, "[u]nder these circumstances, [I] cannot say the jury could not reasonably have found defendant guilty of first degree murder." (*Harris*, *supra*, 43 Cal.4th at p. 1287.)

The majority asserts that *Harris* is distinguishable from this case in two ways. First, the majority states the defendant in *Harris* "armed himself with a butcher knife" and went to the doughnut shop in the middle of the night, while defendant in this case used a pocketknife he carried with him almost every day, and Xique came to defendant's home. (Maj. opn., *ante*, at p. 13.) The *Harris* opinion does not reveal why the defendant had a butcher knife or why the defendant went to the doughnut shop. As I have explained, defendant's use of a pocketknife is stronger evidence of first degree murder than use of a butcher knife. Second, the majority states the defendant in *Harris* had no reason to leave the service window and go to the door where he killed the victim. (Maj. opn., *ante*, at p. 14.) The majority says the lack of any reason for the defendant in

3

*Harris* to approach the victim supports an inference of premeditation. (*Ibid.*) Under that reasoning, the same inference would arise in this case.

The important facts here are that defendant got up from the kitchen table, walked to the open front door of the house, confronted Xique, fatally stabbed him by placing a pocketknife directly in the carotid artery and rib cage, and later said he wanted to fight Xique. This evidence is sufficient for the jury to have concluded defendant weighed the considerations in forming his course of action. The time from the moment at which defendant got up from the kitchen table to the time at which he stabbed Xique was not long—perhaps 10 seconds to one minute. However, "premeditation can occur in a brief period of time." (*People v. Perez* (1992) 2 Cal.4th 1117, 1127.) "'"The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)

Except for the locale of the murder and the size of the knife, this case is not distinguishable in any meaningful way from *Harris*.

Substantial evidence supported a finding that defendant deliberated and premeditated the murder of Xique and, therefore, I would affirm the jury verdict of first degree murder.


FYBEL, J.


4